RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

**17-1734 & 17-1771**

INNOVATION VENTURES, LLC, a Michigan limited liability company,

> *Plaintiff-Appellant/Cross-Appellee*,

> *v.*

CUSTOM NUTRITION LABORATORIES, LLC,

> *Defendant*,

NUTRITION SCIENCE LABORATORIES, LLC, a Texas limited liability company; ALAN JONES,

> *Defendants-Appellees/Cross-Appellants*.

**17-1911**

INNOVATION VENTURES, LLC, a Michigan limited liability company,

> *Plaintiff-Appellant*,

> *v.*

NUTRITION SCIENCE LABORATORIES, LLC, a Texas limited liability company; ALAN JONES; L.O.D.C. GROUP LIMITED; L.O.D.C. INCORPORATED,

> *Defendants-Appellees*.

Nos. 17-1734/1771/1911

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-13850; 4:16-cv-11179—Terrence George Berg, District Judge.

Argued: August 3, 2018

Decided and Filed: December 20, 2018

Before: SILER, GRIFFIN, and STRANCH, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, for Innovations Ventures. Baxter W. Banowsky, BANOWSKY & LEVINE, P.C., Dallas, Texas, for Nutrition Science Laboratories, Alan Jones, and L.O.D.C. **ON BRIEF:** John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, Matthew T. Nelson, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, E. Powell Miller, Martha J. Olijnyk, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Innovations Ventures. Baxter W. Banowsky, BANOWSKY & LEVINE, P.C., Dallas, Texas, for Nutrition Science Laboratories, Alan Jones, and L.O.D.C.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge. Some years ago, Plaintiff Innovation Ventures (Innovation), manufacturer of 5-Hour Energy, settled a lawsuit with the now-defunct Custom Nutrition Laboratories (Custom Nutrition) by entering into a noncompete agreement. When Nutrition Science Laboratories (NSL) subsequently purchased Custom Nutrition's assets, it did not abide by the restrictive covenants in that noncompete agreement. Innovation initially sued Custom Nutrition; NSL; and Alan Jones, an officer of both Custom Nutrition and NSL, and later added a suit against a related company, Lily of the Desert (collectively, Defendants). After protracted litigation, Innovation was awarded nominal damages for its core breach of contract claim. For the reasons explained below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual History

The story of the parties' business relationship and its subsequent deterioration is lengthy and complex, and many of its details are hotly disputed. The district court ably described the relevant events in some detail in one of its summary judgment orders. *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC* (*Innovation Ventures II*), No. 12-13850, 2015 WL 5679879, at *1–7 (E.D. Mich. Sept. 28, 2015). The following is a summary of the critical facts.

1.  Breakdown of the Manufacturing Relationship

Plaintiff Innovation is the maker and distributor of 5-Hour Energy, a well-known "energy shot." In 2004, when Innovation was doing business as Living Essentials, it contracted with Custom Nutrition to manufacture and package 5-Hour Energy. Defendant Alan Jones was the President and CEO of Custom Nutrition at the time and had previously manufactured a two-ounce energy shot called "Shotz." When Living Essentials ended the business relationship some years later—abruptly and unfairly, according to Defendants—Custom Nutrition had a surplus of ingredients and packaging. Jones used the surplus to continue manufacturing 5-Hour Energy for an unspecified amount of time after the relationship ended. Jones averred that his use of the surplus was mitigation of damages protected by the Uniform Commercial Code.

The companies then sued one another, with each claiming that the other had breached the contract, stolen trade secrets or intellectual property, and committed assorted torts. The protracted litigation came to an end almost two years later when, according to Jones, Custom Nutrition was on the verge of bankruptcy. The companies then entered into the Settlement Agreement that is at the center of this litigation.

The Agreement contains an admission that Custom Nutrition and Jones "wrongfully manufactured" products bearing the 5-Hour Energy label, provides that Living Essentials owns the 5-Hour Energy formula, and forbids Custom Nutrition from manufacturing any new "Energy Liquid" that "contain[s] anything in the Choline Family." According to Innovation, ingesting choline and related substances improves focus, and including them in the 5-Hour Energy recipe was a critical innovation. In return for these restrictions and admissions, Living Essentials paid Custom Nutrition $1.85 million. Specific provisions of the Settlement Agreement are discussed in more detail below.

2.  NSL Purchases Custom Nutrition's Assets

In the words of the district court, Custom Nutrition was "in a precarious financial condition," and the cash infusion was insufficient "to enable the company to regain its financial footing." *Innovation Ventures II*, 2015 WL 5679879, at *4. Jones therefore spoke with Don Lovelace, owner of Lily of the Desert, about the possibility of Lily acquiring Custom Nutrition.

Lovelace instead agreed to purchase Custom Nutrition's assets and formed a new corporation, Defendant NSL, which entered into an Asset Purchase Agreement with Custom Nutrition.

The Asset Purchase Agreement provides that NSL acquires Custom Nutrition's listed assets but is not "responsible for any liabilities, liens, security interests, claims, obligations, or encumbrances" of Custom Nutrition except for those listed on an attached schedule—principally, debt Custom Nutrition owed to a bank. The Asset Purchase Agreement includes one reference to the Settlement Agreement: "[T]he formula for energy drinks manufactured by [Custom Nutrition] and certain related trademark and copyright matters are limited by the settlement agreement between [Custom Nutrition] and Living Essentials."

After the execution of the Asset Purchase Agreement, NSL went into the energy shot business. Jones became an employee of Lily and represented himself as President of NSL. NSL marketed itself as a continuation of Custom Nutrition and took on Custom Nutrition's old orders and customers. Over the next few years, NSL produced and distributed energy shots containing choline citrate, choline bitartrate, betaine, and alpha glycerolphosphorylcholine (alpha GPC). The first two substances are listed in the Choline Family definition in the Settlement Agreement; the latter two are, according to Innovation, chemical equivalents to choline covered by the definition's catch-all clause.

### B. Proceedings Below

#### 1. Lead Case (Nos. 17-1734/1771)

Innovation sued Custom Nutrition,[1] NSL, and Jones for breaching the Settlement Agreement and for tortious interference. Proceedings in the district court were protracted.

After rejecting two motions to dismiss raising objections to personal jurisdiction, the district court addressed whether NSL had violated the Choline Family restrictions. It granted partial summary judgment to Innovation based on Defendants' admitted production of energy shots containing choline bitartrate and choline citrate. *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC* (*Innovation Ventures I*), No. 12-13850, 2014 WL 4829582, at *3 (E.D.

---

[1]Custom Nutrition did not respond, and default was entered.

Mich. Sept. 29, 2014).   The court concluded that whether betaine and alpha GPC (which Defendants also admitted to using) were included in the catch-all clause in the Choline Family definition was ambiguous as a matter of law.  *See id.* at *2–3.  A jury trial was convened to determine whether the two ingredients were included in the clause's scope; the jury concluded that both were.

The district court then turned to issues related to liability under the Settlement Agreement.  The court concluded that:  (1) NSL was bound by the Choline Family restrictions in the Settlement Agreement by virtue of their incorporation into the Asset Purchase Agreement, *see Innovation Ventures II*, 2015 WL 5679879, at *16–19; (2) Jones was bound by the Settlement Agreement because he signed it, *see id.* at *20–21; and (3) the twenty-year duration of the Settlement Agreement was unreasonable under Michigan law, necessitating reformation of the contract to last only three years, *see id.* at *24–25.

After another round of briefing, the district court turned to the remaining issues, concluding that:  (1) Innovation was not entitled to summary judgment as to liability on its main breach of contract claim because NSL's affirmative defense of laches raised factual disputes, *see Innovation Ventures, LLC v. Custom Nutrition Labs., LLC* (*Innovation Ventures III*), 256 F. Supp. 3d 696, 704 (E.D. Mich. 2017); and (2) Innovation's three proposed methodologies for calculating damages were impermissible, although Innovation could "still recover lost profits under a non-patent-infringement specific method of calculation," *see id.* at 710–12 & n.8.

That order was handed down about one month before the final jury trial was scheduled to begin.   According to Innovation, the order left it "without any theory of actual damages to present to the jury, leaving only the theory of nominal damages" on which it could recover with regard to its primary claim.  Count III, alleging that Jones breached the Settlement Agreement by cooperating with adverse parties, had yet to be resolved.  *See id.* at 715.  The parties therefore entered four stipulations "[f]or the purpose of expediting appeal of the previous orders and judgment":

1. The parties stipulate to the dismissal of Count III of Plaintiff's Second Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1).

2. The parties stipulate that the meaning of "any successful order" as used in Section 20 of the Settlement Agreement does not encompass a judgment or order for nominal damages.[2]

3. The parties stipulate that, if awarded, nominal damages are $1.

4. The parties stipulate that nominal damages in the amount of $1 do not constitute sufficient prejudice to support the affirmative defense of laches under Michigan law.

The parties submitted a proposed judgment awarding nominal damages to Innovation. Counsel for both parties signed the proposed judgment, indicating that it was "Approved as to Form Only and Preserving All Rights of Appeal."

The district court had reservations about this resolution, explaining that it was "not certain that entering this proposed judgment will actually preserve" either party's right to appeal. It nonetheless entered judgment in Innovation's favor on Count I and awarded nominal damages. Innovation appealed, and NSL cross-appealed.

2. Secondary Case (No. 17-1911)

As the Lead Case was proceeding in the district court, Innovation brought a new suit against NSL, adding a new defendant: Lily of the Desert. According to the complaint, discovery in the Lead Case revealed that Lily was also liable under the Settlement Agreement because of its relationship with NSL. Innovation brought the Secondary Case to prevent NSL from "play[ing] shell games to avoid liability and any potential judgment." All claims in the Secondary Case relate to the same nucleus of fact as in the Lead Case, and Innovation concedes that the claims in the Secondary Case "rise or fall with the rulings in the lead case."

All parties agreed the judgment in the Lead Case rendered the claims in the Secondary Case "effectively moot," so the district court entered judgment in favor of Defendants. *Innovation Ventures, LLC v. Nutrition Sci. Labs., LLC* (*Innovation Ventures IV*), No. 16-11179,

---

[2]Section 20 of the Settlement Agreement provides that a party seeking to enforce the Agreement "shall be entitled to its attorney's fees upon obtaining any successful order against the Party against whom such enforcement is sought."

2017 WL 4553429, at *1–2 (E.D. Mich. July 17, 2017).  Innovation appealed.  The two cases were consolidated on appeal.

## II.  ANALYSIS

### A.  Jurisdiction

Defendants raise two jurisdictional objections:  lack of appellate jurisdiction and lack of personal jurisdiction over both Jones and NSL.  We may review jurisdictional objections in any order.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (explaining that "there is no unyielding jurisdictional hierarchy" as between subject-matter and personal jurisdiction).

#### 1.  Appellate Jurisdiction

Defendants argue that the judgment pursuant to stipulations in the Lead Case was not a final appealable decision for purposes of 28 U.S.C. § 1291.[3]

Defendants did not raise this argument before the district court.  To the contrary, when the district court questioned Defendants' counsel—the same counsel representing them on appeal—about whether the stipulations could result in a "final resolution," counsel responded that "there is Sixth Circuit case law for the proposition that a plaintiff can dismiss with prejudice the remaining claims if they feel that the main thrust of their case has been already decided" and that "the Sixth Circuit does actually authorize a procedure just very much like this in order to finalize a case, resolve all the issues, and make it ripe for appeal."  The inconsistency between the representations made to the district court and those included in the motion to dismiss is concerning but does not change our approach to the jurisdictional question at hand.  We must satisfy ourselves that appellate jurisdiction exists even when neither party raises the issue.  *See Bd. of Trs. of Plumbers, Local Union No. 392 v. Humbert*, 884 F.3d 624, 625 (6th Cir. 2018).

Appellate courts have jurisdiction to hear "appeals from all final decisions of the district courts."  28 U.S.C. § 1291.  A decision is final for the purposes of § 1291 if it "ends the litigation

---

[3]Defendants have not moved to dismiss the appeal in the Secondary Case, although they argue that that appeal is frivolous and that Innovation should be sanctioned for pursuing it.  Appellate jurisdiction in the Secondary Case is not in doubt.  The judgment in the Secondary Case was entered on the basis of preclusion, not pursuant to stipulations.

on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). This "firm finality principle [is] designed to guard against piecemeal appeals." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1707 (2017). There is also a long-standing rule that a party may not appeal a judgment to which it consented. *See United States v. Babbitt*, 104 U.S. 767, 768 (1881); *Scholl v. Felmont Oil Corp.*, 327 F.2d 697, 700 (6th Cir. 1964). Satisfaction of that rule is a requirement of § 1291. *See Raceway Props., Inc. v. Emprise Corp.*, 613 F.2d 656, 657 (6th Cir. 1980) (per curiam). We therefore must determine whether this judgment entered pursuant to stipulations comports with § 1291's requirements.

### a. The Raceway Standard

There is an important exception to the rule prohibiting appeals from judgments to which the appellant consented. As we explained in *Raceway Properties*, an appeal is permissible when "solicitation of the formal dismissal was designed only to expedite review of an order which had in effect dismissed appellants' complaint." *Id.* (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958)).

*Procter & Gamble*, the Supreme Court decision upon which *Raceway* relied, was an antitrust case in which the Government had refused to produce a grand jury transcript. 356 U.S. at 678–79. On the Government's suggestion, the district court entered an order providing that, if the Government did not produce the transcript by a particular date, the case would be dismissed. *Id.* at 679. The case was subsequently dismissed and appealed to the Supreme Court, where Procter & Gamble argued that the appeal should be dismissed because "a plaintiff who has voluntarily dismissed his complaint may not sue out a writ of error." *Id.* at 680. The Court explained that rule "ha[d] no application here" because "[w]hen the Government proposed dismissal for failure to obey, it had lost on the merits and was only seeking an expeditious review." *Id.* at 680–81. The Supreme Court distinguished between consenting to the substance of a judgment and consenting to its form: "The plaintiffs did not consent to a judgment against them, but only that, if there was to be such a judgment, it should be final in form instead of interlocutory, so that they might come to this court without further delay." *Id.* at 681 (quoting *Thomsen v. Cayser*, 243 U.S. 66, 83 (1917)).

In *Raceway*, we held that expeditious review could be sought in this manner in contexts other than discovery disputes.    *Raceway*, also an antitrust suit, involved a partial summary judgment decision that had defined the market at issue:

> Appellants took issue with the district court's determination of the relevant market.  Appellants informed the court they believed the court's order effectively terminated the lawsuit since they were not prepared to and could not proceed with evidence regarding the relevant market outlined by the court.  The appellants requested a formal order of dismissal so that they could proceed with an appeal challenging the district court's ruling on the scope of the relevant market.  Such an order was entered and this appeal followed.

613 F.2d at 657.  We permitted the appeal on the grounds quoted above:  "[S]olicitation of the formal dismissal was designed only to expedite review of an order which had in effect dismissed appellants' complaint."  *Id.*

The *Raceway* rule subsequently found purchase.  Thus, for example, we heard an appeal pursuant to *Raceway* when a plaintiff sought voluntary dismissal of her suit after the district court "had dismissed finally the only viable claim which she had advanced" even though the court "offered to hear her suit to the degree that it sounded in negligence." *Bogorad v. Eli Lilly & Co.*, 768 F.2d 93, 94 (6th Cir. 1985); *see also Sandul v. Larion*, No. 94-1233, 52 F.3d 326 (Table), 1995 WL 216919 (6th Cir. Apr. 11, 1995).  By contrast, *Raceway*'s requirements were not satisfied when a plaintiff consented to dismissal with prejudice after denial of his motion to remand to state court; we explained that the statute of limitations and failure to exhaust defenses that the plaintiff argued would have doomed his federal claim had not been fully aired and might have been decided in his favor. *Laczay v. Ross Adhesives, Div. of Conros Corp.*, 855 F.2d 351, 355 (6th Cir. 1988).  As recently as four years ago, we considered an appeal of final stipulations entered pursuant to *Raceway* without even pausing to consider whether § 1291 was satisfied. *See Ram Int'l, Inc. v. ADT Sec. Servs.*, 555 F. App'x 493, 496–97 (6th Cir. 2014).

Other circuits cite *Raceway* with approval. *See, e.g.*, *Helm Fin. Corp. v. MNVA R.R., Inc.*, 212 F.3d 1076, 1080 (8th Cir. 2000); *Trevino-Barton v. Pittsburgh Nat'l Bank*, 919 F.2d 874, 878 (3d Cir. 1990); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 94 (2d Cir. 1987). *Wright & Miller* cites *Empire Volkswagen* (a Second Circuit case which in turn relied on *Raceway*) as an example of a good approach to the problem of voluntary or

invited dismissals.  *See* 15A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3914.8 (2d ed. Supp. 2018) ("There is much to be said for a rule that routinely permits a plaintiff to manufacture finality by abandoning all remaining parts of a case but that forbids any attempt at recapture.").

We have, however, staked out two important limits on the application of *Raceway*.  First, parties may not appeal claims that were dismissed without prejudice.  *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1034 (6th Cir. 1993).  Second, if a party seeks to come within the *Raceway* exception, she should make "her intention known to the court and opposing parties."  *Laczay*, 855 F.2d at 354.  "While it is possible for a party to consent to a judgment and still preserve his right to appeal, he must reserve that right unequivocally, as it will not be presumed."  *Id.* (quoting *Coughlin v. Regan*, 768 F.2d 468, 470 (1st Cir. 1985)).

### b.  The Status of Raceway in Light of Microsoft

Defendants point out that *Raceway* and accompanying circuit precedent must be interpreted in light of the recent Supreme Court decision in *Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017).  *Microsoft* involved an appeal by plaintiffs who had been denied class-action certification and Rule 23(f) permission to appeal that denial.  *Id.* at 1706.  Instead of pursuing their individual claims to final judgment, plaintiffs voluntarily dismissed their claims with prejudice but "reserved the right to revive their claims" in case of remand.  *Id.* at 1706–07.

The Supreme Court held that this type of voluntary dismissal did not satisfy the finality requirement of § 1291.  *Id.* at 1707.  The Court was centrally concerned with the possibility that the plaintiffs' tactic would severely undermine the "careful calibration" of Rule 23(f).  *Id.* at 1714–15.  *Microsoft* also explained that the finality requirement would be transformed into a "pretty puny" rule if plaintiffs could unilaterally transform interlocutory orders into final ones "simply by dismissing their claims with prejudice—subject, no less, to the right to 'revive' those claims."  *Id.* at 1715 (citation omitted).  In a footnote, *Microsoft* distinguished *Procter & Gamble* because "that case—a civil antitrust enforcement action—involved neither class-action certification nor the sort of dismissal tactic at issue here."  *Id.* at 1715 n.11.

We have discussed *Microsoft* in only one published case.   In *Board of Trustees of Plumbers, Local Union No. 392 v. Humbert*, the district court held at summary judgment that two of the three defendant companies were bound by a collective bargaining agreement. 884 F.3d at 625.   The plaintiff union and the two bound companies then entered a "Stipulated Judgment Order" providing for approximately $45,000 in damages.  *Id.*   The order stated that it was entered "for the sole purpose of proceeding with the appeal" and that "none of the parties are waiving any rights or arguments in any subsequent proceedings, . . . including but not limited to the amount of the damages to which the Plaintiffs are entitled to recover." *Id.* (brackets omitted). We held that the order was not final for purposes of § 1291 because it "does not even conclusively resolve the single issue that it purports to resolve—namely, Local 392's damages arising between January 2010 and August 2011—because the Order specifically reserves the parties' right to litigate 'the amount of the damages.'"  *Id.* at 626; *see also Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 735 F. App'x 208, 210 (6th Cir. 2018) (dismissing an appeal pursuant to *Microsoft* and *Humbert* because "Wells Fargo has demanded an indeterminate amount of damages from Allstate, and the district court has to settle on an amount before we will hear an appeal").

*Microsoft* and *Humbert* are centrally concerned with the principle, helpfully articulated in *Page Plus of Atlanta, Inc. v. Owl Wireless, LLC*, 733 F.3d 658, 659 (6th Cir. 2013), that a "conditional dismissal of unresolved claims [or issues], in which the party reserves the right to reinstate those claims [or issues]" does not create finality.   But appeals pursuant to *Raceway* do not necessarily invoke the specter of reviving claims or subsidiary issues upon remand.  Many *Raceway* cases involve an entirely different set of circumstances from those discussed in *Microsoft*, *Humbert*, and *Page Plus*.   For example, a *Raceway* dismissal may simply allow parties to stipulate to issues or theories that they are electing not to pursue—as, for example, was the case in *Bogorad*, where the plaintiff voluntarily dismissed her suit rather than accept the court's offer to consider her case as one sounding in negligence.  768 F.2d at 94.  It would be perverse indeed if we required a plaintiff to pursue a theory that she did not consider meritorious simply to preserve her right to appeal.  And that proposition does not run afoul of the rule against conditional resolution:  Should the plaintiff win remand, she would be barred from changing her mind and electing to pursue a negligence theory after all.

Importantly, the bases on which the Supreme Court distinguished *Procter & Gamble* apply equally to *Bogorad* and the instant case.  Neither involves class-action certification, and neither involves a plaintiff unilaterally dismissing undecided claims subject to a right to revive. *See Microsoft*, 137 S. Ct. at 1715 n.11.  So although *Microsoft* may have limited *Raceway*'s scope, it did not abrogate *Raceway*'s operation.

### c. Applying Raceway *to the Present Case*

The remaining question, then, is whether the purported *Raceway* dismissal in this case falls within permissible boundaries.

In the aftermath of the summary judgment order, liability as to Innovation's main claim was undecided due to the factual disputes relating to Defendants' laches defense. *See Innovation Ventures III*, 256 F. Supp. 3d at 704.  Damages had yet to be determined.  Although the court had ruled out Innovation's proposed methodologies, it took care to explain that Innovation could "still recover lost profits" by submitting facts and circumstances to the jury that would allow for a reasonable estimate of the amount. *See id.* at 710–12 & n.8.  A factual dispute also remained on Count III, a secondary claim alleging that Jones had breached the Settlement Agreement by cooperating with adverse parties. *See id.* at 715.  Despite these open questions, the parties agreed that only one outcome was possible:  judgment in favor of Innovation for nominal damages.

The parties' logic was this.  With regard to Innovation's core breach of contract claim, the district court had refused permission to present to the jury any of the damages evidence that Innovation had prepared.  With less than a month until trial and discovery and expert report deadlines long past, Innovation saw no feasible way to implement the district court's suggestion to "place before the jury all of the facts and circumstances that tend to prove the probable amount" of lost profits. *Id.* at 711 n.8.  Injunctive relief was likewise impossible; the district court had reformed the Settlement Agreement to last only three years, all of which had already elapsed. *See id.* at 706 n.5 (clarifying, in 2017, that the restrictive covenants began running in 2009).  Only nominal damages remained.

That minimal recovery in turn decided the remaining issues.  The only way that Innovation could receive attorney's fees was via the Settlement Agreement, which provided that

a party seeking to enforce that Agreement "shall be entitled to its attorney's fees upon obtaining any successful order against the Party against whom such enforcement is sought."  Innovation was willing to concede that an award of nominal damages was not "successful."  Likewise, Defendants' only remaining defense to liability on the breach of contract claim was laches, which is triggered only if there is a showing of prejudice.  *Township of Yankee Springs v. Fox*, 692 N.W.2d 728, 734 (Mich. Ct. App. 2004) (per curiam).  Defendants were willing to concede that a judgment of nominal damages did not amount to prejudice.  As for the lingering Count III, Innovation stipulated to its dismissal with prejudice.

As we turn to our *Raceway* analysis, the first point to be made clear is that Innovation's stipulated dismissal of Count III does not impact the calculus.  Count III was dismissed with prejudice, as is required for a *Raceway* appeal.  *See Libbey-Owens-Ford Co.*, 982 F.2d at 1034.  When a district court enters judgment against a plaintiff on some claims and the plaintiff voluntarily relinquishes the claims that remain, "this Court will not penalize the plaintiff by dismissing his or her appeal."  *Hicks v. NLO, Inc.*, 825 F.2d 118, 120 (6th Cir. 1987) (per curiam); *see also Page Plus*, 733 F.3d at 661 (distinguishing the permissible voluntary dismissal in *Hicks* from the impermissible conditional dismissal at issue in that case).

Second, it is irrelevant that Innovation won an award of nominal damages.  We have consistently allowed plaintiffs who were awarded nominal damages to appeal despite technically winning their suit.  *See, e.g.*, *Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1102 (6th Cir. 1989); *Hilliard v. Williams*, 516 F.2d 1344, 1345 (6th Cir. 1975), *vacated on other grounds*, 424 U.S. 961 (1976); *United States v. Gordin*, 9 F.2d 394, 394–95 (6th Cir. 1925); *Mosher v. Joyce*, 51 F. 441, 444 (6th Cir. 1892).  The logic underpinning these cases is obvious:  It is a rare defendant indeed who would pay to appeal a case in which she lost a trivial amount of money.  A rule forbidding a plaintiff to appeal an award of nominal damages would, in the vast majority of suits awarding nominal damages, be a rule barring any appeal at all.

Third, like the plaintiff in *Bogorad* who was not required to pursue a negligence theory, Innovation is not required to pursue theories it has not prepared and does not wish to pursue.  The plaintiff is the master of her complaint and may choose the remedies she wishes to request.  *See Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 407 (6th Cir. 2007).  *Raceway*

itself involved a plaintiff with a similar evidentiary dilemma to that faced by Innovation. Subsequent to the summary judgment ruling, "[a]ppellants informed the court they believed the court's order effectively terminated the lawsuit since they were not prepared to and could not proceed with evidence regarding the relevant market outlined by the court." 613 F.2d at 657. A plaintiff should not be forced to pursue every court-conceived theory to preserve her right to appeal.

Fourth, unlike in *Humbert* and *Microsoft*, the stipulations at issue in this case do not "specifically reserve[] the parties' right to litigate" the very issues that they purport to resolve. *Humbert*, 884 F.3d at 626; *see also Microsoft*, 137 S. Ct. at 1706–07. There must be some mechanism in place for parties to resolve outstanding issues in the wake of a summary judgment order without necessarily proceeding to trial on each one. *See Brown v. Cinemark USA, Inc.*, 876 F.3d 1199, 1201 (9th Cir. 2017) (order) ("The resolution of the present case was not a unilateral dismissal of claims, but a mutual settlement for consideration reached by both parties which expressly preserved certain claims for appeal."); *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675, 682 (7th Cir. 2001) ("Parties often stipulate to issues such as damages once the district court resolves liability, but an agreement on a specific issue differs from asking the court to enter judgment, which winds up the case itself."). On remand, none of the stipulated issues will be open for debate: Count III will not spring back to life, and nominal damages will not support an award of attorney's fees or constitute prejudice for purposes of laches.

Finally, Innovation's intention to appeal pursuant to *Raceway* was "known to the court and opposing parties." *Laczay*, 855 F.2d at 354. The first line of the stipulations indicated that they were being entered into "[f]or the purpose of expediting appeal of the previous orders and judgment in this case." At a status conference, Innovation explained to the district court that "what we're trying to accomplish here with the stipulations, is to resolve the liability and all the remaining issues, and then the parties can choose, you know, what they are going to take up on appeal."

For all these reasons, this appeal fits within the boundaries of *Raceway* and *Microsoft*, and jurisdiction is proper under § 1291. Defendants' motion to dismiss is therefore denied. Going forward, Innovation "may contest, and we will consider, only those portions of [the

district court's orders in *Innovation I*, *II*, and *III*] *decided* adversely to [it]." *Empire Volkswagen*, 814 F.2d at 94.  The same is true, of course, of the cross-appellants.

### 2. Personal Jurisdiction

Defendants make their second jurisdictional argument in their cross-appeal.  There, they "conditionally seek review" of the district court's personal jurisdiction determinations if—but only if—we rule that the Settlement Agreement may be enforced for more than three years or that Innovation can present its damages evidence.

When personal jurisdiction is at issue, it must be settled before reaching the merits of the case.  *Bird v. Parsons*, 289 F.3d 865, 872–73 (6th Cir. 2002).  We review questions of personal jurisdiction de novo.  *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 388 (6th Cir. 2017).

Unlike subject-matter and appellate jurisdiction, objections to personal jurisdiction can be and frequently are waived:

> In the typical waiver scenario, a defendant waives its personal jurisdiction defense if submissions, appearances and filings give the plaintiff a reasonable expectation that the defendant will defend the suit on the merits or cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking.

*Means v. U.S. Conference of Catholic Bishops*, 836 F.3d 643, 648 (6th Cir. 2016) (alterations, citation, and internal quotation marks omitted).  Similarly, if a defendant makes a motion under Rule 12(b)(2) to (5) but does not raise lack of personal jurisdiction, any objection is waived by operation of Rule 12(h)(1).  *Id.* at 648–49.

In the Secondary Case, NSL filed a motion to dismiss "pursuant to Fed. R. Civ. P. 12(b)(2) and (6)," but neglected to make any argument under Rule 12(b)(2)—that is, to personal jurisdiction.  By failing to object to personal jurisdiction in its initial Rule 12 motion, NSL waived the defense.  *See Means*, 836 F.3d at 648–49.

NSL argues that its failure to raise personal jurisdiction was excused because the defense was not "available" at the time NSL made its Rule 12 motion.  *See* Fed. R. Civ. P. 12(g)(2).  We will accept for purposes of argument the Federal Circuit's rule that an objection is not "available" within the meaning of Rule 12(g)(2) when the objection "is futile in the sense that the

law bars the district court from adopting it to dismiss." *In re Micron Tech., Inc.*, 875 F.3d 1091, 1097 (Fed. Cir. 2017). NSL argues that a personal jurisdiction objection was futile because the district court made clear in hearings that the rulings in the Lead Case—presumably including those rulings related to personal jurisdiction—controlled in the Secondary Case as well. But the hearing in which the district court expressed that position took place approximately six months after NSL filed its motion to dismiss. So at the time the Rule 12 motion was made, Defendants did not know it was futile. Indeed, the inclusion of Rule 12(b)(2)—dismissal for lack of personal jurisdiction—in the motion's header, if not its substance, acknowledges the possibility that it could be raised. NSL's objection to personal jurisdiction was therefore waived in the Secondary Case.

In the Lead Case, by contrast, Defendants filed the Rule 12 motions that would ordinarily suffice to preserve the objection to personal jurisdiction. On appeal, however, they challenge the district court's conclusion as to personal jurisdiction if and only if we reverse those findings by the district court that favored them. Defendants cite no authority for the proposition that it is possible to consent to jurisdiction only on the condition that the court finds in its favor, and we are aware of none. Defendants consented to this court's jurisdiction so long as we found in their favor and so waived the objection.

Because the decision below was final for purposes of § 1291 and because the objection to lack of personal jurisdiction was waived in both the Lead and the Secondary Cases, we proceed to the merits of the case.

**B. Defendants' Dismissed Antitrust Claim**

We begin with an issue that logically precedes the primary issues on appeal: Defendants' challenge to the district court's dismissal of their antitrust counterclaim as barred by the statute of limitations. Defendants argue that their counterclaim relates back to their original counterclaim.

We review de novo the district court's conclusion that allegations in an amended pleading do not relate back to the original pleading. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516 (6th Cir. 2007). An amendment relates back to the date of

the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). When applying this standard, we "ask[] whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading." *Bledsoe*, 501 F.3d at 516.

Count III of Defendants' original counterclaim, titled "Declaration that Settlement Agreement is an Illegal Restraint on Trade," alleges that the Choline Family restrictions in the Settlement Agreement are unenforceable because they are "nothing more than an agreement to limit competition." Defendants, without citing any Rule 15 caselaw, argue that the phrase "restraint on trade" and the accompanying factual allegations were "sufficient to place Innovation on notice that its anti-competitive behavior would be at issue in this case." But an antitrust claim must allege an antitrust injury. *See Bassett v. NCAA*, 528 F.3d 426, 432 (6th Cir. 2008). The factual allegations in the second amended counterclaim that might establish an antitrust injury—allegations related to Innovation's history of monopolistic and anticompetitive behavior—were absent from the original and first amended counterclaims. In the absence of any reference to antitrust law or the Sherman Act, or any description of an antitrust injury, Innovation was not "on notice that [it] could be called to answer for" an antitrust violation. *Bledsoe*, 501 F.3d at 516.

Because we agree with the district court that the antitrust counterclaim did not relate back to the original counterclaim, we affirm the dismissal of this counterclaim.

### C. Interpreting the Settlement Agreement

We next consider a set of arguments challenging the district court's interpretations of the Settlement Agreement. The parties challenge the district court's conclusions that: (1) Jones is bound by the Settlement Agreement in his personal capacity, *see Innovation Ventures II*, 2015 WL 5679879, at *20–21; (2) NSL is bound by the restrictive covenant provisions in § 5.c of the Settlement Agreement by virtue of their incorporation into the Asset Purchase Agreement, *see id.* at *16–19; (3) the catch-all clause in the Choline Family definition is ambiguous as a matter of law, *see Innovation Ventures I*, 2014 WL 4829582, at *2; and (4) the duration of the restrictive

covenant provision is unreasonable as written and so must be reformed from twenty years to three, *see Innovation Ventures II*, 2015 WL 5679879, at \*22–24.  We consider the arguments in this order.

The parties do not dispute that the Settlement Agreement must be interpreted according to Michigan law.  "In Michigan, contract interpretation is a question of law and therefore subject to de novo review."  *Solo v. UPS Co.*, 819 F.3d 788, 794 (6th Cir. 2016).  "[W]e look to the final decisions of [Michigan's] highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it."  *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013).  In making that guess, intermediate appellate decisions are "viewed as persuasive unless it is shown that the state's highest court would decide the issue differently."  *Id.* at 359 (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)).  We are also bound by our own published precedent interpreting Michigan law, except where our decisions have subsequently been called into question by Michigan courts.  *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009).

1. <u>Whether Jones Is Bound</u>

Defendants argue that the Settlement Agreement does not bind Defendant Jones in his personal capacity.

Innovation's first response is that Jones admitted at trial that he is a party to the Settlement Agreement and so is estopped from contesting it now.  Jones was asked, "Well, you are a party—and you are a party to the settlement agreement, right?  You are a CNL party."  He responded, "Right."  Jones is not an attorney.  His statement is more properly viewed as a concession that he is listed as a CNL party in the text of the Settlement Agreement than as an admission that he is bound in his personal capacity.  We therefore turn to the merits of the capacity issue.

The Michigan statute of frauds provides that any contract that, "by its terms, is not to be performed within 1 year" is void unless it is "in writing and signed with an authorized signature by the party to be charged with the agreement."  Mich. Comp. Laws. § 566.132(1).  The

restrictive covenants in the Settlement Agreement last "the same length of time that an issued patent would provide protection"—that is, 20 years. *See* 35 U.S.C. § 154(a)(2). By operation of the statute of frauds, then, the Settlement Agreement may not be enforced against any party who did not sign it.

Jones signed the Agreement, but he did so only once and labeled his signature "President and CEO." The relevant portion of the signature page appears as follows:

**IN WITNESS WHEREOF,** each Party has executed this Agreement.

CUSTOM NUTRITION LABORATORIES, LLC
FOR ITSELF AND ALL OF THE CNL PARTIES

By: *Alan Jones*

PRINTED NAME: *Alan Jones*

ITS: *President & CEO*

DATE: August 17th, 2009

Jones did not sign the Agreement anywhere else, although he did initial each page. The Agreement defines the referenced "CNL Parties" to include Custom Nutrition; its heirs, affiliates, successors, assigns, and so on; and its officers and employees, "including, without limitation, Alan Jones."

Michigan courts have explained that, when contracting parties wish to ensure that a corporate officer is bound in both an individual and an official capacity, "the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (per curiam) (quoting *Geresy v. Dommert*, No. 243468, 2004 WL 1222991, at *5 (Mich. Ct. App. June 3, 2004) (per curiam)). Following that practice strongly supports a conclusion that the signatory is bound in both capacities. *See, e.g.*, *Lexon Ins. Co. v. Naser*, 781 F.3d 335, 340–41 (6th Cir. 2015) (citing *Livonia* and concluding that an individual who signed a contract once as CEO and once with his social security number was bound in his individual capacity). That practice was not followed here.

When the signatory signed only once, Michigan courts apply normal contract law principles to discern the parties' intent. Michigan courts presume that when "appropriate words added to the signature of [the individual] indicated that he signed on behalf of the corporation in the representative capacity designated," the individual is not bound in his personal capacity. *Wright v. Drury Petroleum Corp.*, 201 N.W. 484, 485 (Mich. 1924). But that presumption may be rebutted: "Where anything on the face of the paper suggests a doubt as to the party bound, or the character in which any of the signers had acted in affixing his name, testimony may be admitted between the original parties to show the true intent." *Armstrong v. Andrews*, 67 N.W. 567, 568 (Mich. 1896) (citation omitted).

Past cases provide useful examples of how courts applying Michigan law analyze a single signature. In *Livonia*, the individual signed one time, he labeled his signature "President," and the space for a guarantor was left blank. 742 N.W.2d at 146. The Michigan Court of Appeals concluded that the "signature on the document was a corporate signature and that [the signatory] did not personally guarantee" the debts at issue. *Id.* In *Andersons, Inc. v. Horton Farms, Inc.*, we applied Michigan law to decide the capacity in which Horton, the president of the eponymous defendant company, had signed nine contracts. 166 F.3d 308, 315–16 (6th Cir. 1998). We determined that five of the contracts "unambiguously show[] that the parties intended to bind Mr. Horton only in his corporate capacity" because they were signed "Rodney Horton, Pres.," were addressed to Horton Farms, Inc., and listed Horton Farms as the customer on every page. *Id.* at 316. But four contracts were "signed simply 'Rodney Horton,'" which created ambiguity that could be resolved only by considering parol evidence. *Id.*

*Employees Only, Inc. v. Provenzano*, No. 296575, 2011 WL 1687626 (Mich. Ct. App. May 3, 2011) (per curiam), provides a rare example of a case in which a Michigan court was willing to partially disregard a corporate label attached to a signature. There, the contract explicitly stated that "officers shall be personally liable for amounts not paid under this Agreement," but it was "undisputed that the contract was signed by [the corporation] through Provenzano in his representative capacity." *Id.* at *4. The Michigan Court of Appeals concluded that, because "the signature blocks in the Agreement provide no place for additional signatures for individuals to signal they accept personal liability apart from the corporation, which

explicitly conflicts with the previously cited provisions that call for such liability," the contract was ambiguous and summary disposition was inappropriate. *Id.*

Perhaps the most helpful example is a recent Michigan case involving very similar facts to the case at hand, including one of the same parties. There, as here, Innovation had entered into a contract containing noncompete provisions that "purport[ed] to bind the employees of defendant." *Innovation Ventures, LLC v. Liquid Mfg., LLC* (*Liquid Mfg. I*), No. 315519, 2014 WL 5408963, at *1, 6 (Mich. Ct. App. Oct. 23, 2014) (per curiam). The Michigan Court of Appeals made quick work of the argument that the individual defendant was personally liable, citing *Livonia* and explaining that the defendant had signed "in his capacity as a corporate officer, and not as an individual." *Id.* at *6. When that case was appealed to the Michigan Supreme Court and partially overturned, this holding was left undisturbed: "Since the plaintiff has not challenged the Court of Appeals' holding [that Paisley is not individually liable], we do not upset its decision. Paisley is not individually liable because he signed the Agreement in his capacity as a corporate officer." *Innovation Ventures, LLC v. Liquid Mfg., LLC* (*Liquid Mfg. II*), 885 N.W.2d 861, 867 n.6 (Mich. 2016).

In this case, Jones's signature is labeled "President and CEO." Both *Livonia*, 742 N.W.2d at 146, and *Andersons*, 166 F.3d at 316, make clear that the label attached to a signature is strong evidence of the capacity in which a contract was signed. The Settlement Agreement mentions Jones by name, and the signature block provides that Jones signs "for [Custom Nutrition] and all of the CNL Parties." However, unlike the contract in *Employees Only*, this Agreement is centrally concerned with business negotiations and does not explicitly provide for personal liability. *See* 2011 WL 1687626, at *4. Thus, as in *Liquid Manufacturing I*, which decided this precise issue when interpreting a noncompete contract being enforced by this precise plaintiff, we cannot conclude, as a matter of law, that the Agreement binds Jones in his individual capacity.

We therefore reverse the district court's holding on this issue and conclude that the Settlement Agreement does not bind Jones in his personal capacity.

2. <u>Whether NSL Is Bound</u>

NSL was not a party to the Settlement Agreement and so would not ordinarily be bound by its terms. The district court concluded, however, that § 5.c of the Settlement Agreement—containing the Choline Family restrictions—was incorporated by reference into the Asset Purchase Agreement between Custom Nutrition and NSL, such that the restrictive covenants bind NSL. *Innovation Ventures II*, 2015 WL 5679879, at *16–19. Defendants challenge that incorporation decision.

The Asset Purchase Agreement contains a Texas choice of law provision, and the parties do not dispute that Texas law governs the incorporation inquiry. Under Texas law, "[i]t is uniformly held that an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the document signed by the defendant plainly refers to another writing." *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968). The referenced document may be incorporated in whole or in part, depending on the referring language used. *See Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App. 2013). "[T]he primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument," and "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *In re C&H News Co.*, 133 S.W.3d 642, 645 (Tex. App. 2003).

Section 4.2(r) of the Asset Purchase Agreement provides that "the formula for energy drinks manufactured by [Custom Nutrition] and certain related trademark and copyright matters are limited by the settlement agreement between [Custom Nutrition] and Living Essentials and the related consent judgments contained in Schedule 4.2(h)." Schedule 4.2(h) lists, under the header "Settled," that NSL entered into a "Settlement Agreement and Consent Judgment" with Innovation. The parties dispute whether § 4.2(r) "plainly refers" to the Settlement Agreement. *Owen*, 433 S.W.2d at 166. "Plainly referring to a document requires more than merely mentioning the document. The language in the signed document must show the parties intended for the other document to become part of the agreement." *Bob Montgomery Chevrolet*, 409 S.W.3d at 189 (citation omitted).

Two Texas cases illustrate the difference between "merely mentioning" and "plainly referring." In *Bob Montgomery Chevrolet*, a car dealership signed a one-page application that stated that "[a]dditional benefits, qualifications and details" related to the program were available at a particular website. *Id.* at 184–85. Terms on that website included a six-month minimum term, a Texas choice-of-law provision, and a Texas forum-selection clause. *Id.* at 185. The Texas Court of Appeals concluded that the contractual language did not "plainly refer" to the additional online terms as part of the parties' agreement, but rather "indicates that the internet document contained informative material only, not binding terms and conditions intended to be part of the parties' contract." *Id.* at 190. By contrast, in *C&H News Co.*, the same court was called upon to interpret a one-page arbitration agreement providing that the employee "agreed to submit all claims or disputes between [the employer and the employee] to binding arbitration as provided in the Handbook." 133 S.W.3d at 646. The Texas Court of Appeals had no trouble concluding that "the agreement incorporates, by reference, portions of the employee handbook into the agreement"—in particular, the section labeled "Mutual Arbitration Policy/Procedures." *Id.*

The acknowledgment in the Asset Purchase Agreement that NSL's rights to the formula were "limited by the settlement agreement" cannot reasonably be read to indicate that the Settlement Agreement "contain[s] informative material only." *Bob Montgomery Chevrolet*, 409 S.W.3d at 190. Unlike *Bob Montgomery*'s boilerplate, nonspecific reference to "additional" details, § 4.2(r) is a tailored description of intellectual property rights in a negotiated contract between sophisticated, counseled parties.

As to the portion of the Settlement Agreement that this language incorporates, we agree with the district court that § 4.2(r) incorporates the Choline Family restrictions in § 5.c specifically. These restrictive covenants directly and meaningfully impact "the formula for energy drinks manufactured by [Custom Nutrition]" because they explain what ingredients Custom Nutrition's formula cannot include. In addition, the parties to the Settlement Agreement signaled the importance of the restrictive covenants by allocating $1.8 million of the $1.85 million settlement to that section. It would be illogical to conclude that one of the same

parties overlooked the existence of that key section only a few months after the Settlement Agreement was executed.

Defendants' main counterargument is that other sections of the Asset Purchase Agreement limit the obligations that NSL incurred on behalf of Custom Nutrition.  They point to, for example, § 1.2, which provides that NSL is not responsible for "any liabilities, obligations, or costs resulting from any claim or lawsuit," except for those described in § 1.3—which does not include the Settlement Agreement.  Defendants are correct that the language of § 4.2(r) should, if possible, be read to "harmonize" with the limitations on liability found elsewhere in the Agreement.  *C&H News*, 133 S.W.3d at 645.  But those limitations should not be read to render § 4.2(r) a nullity; rather, § 4.2(r) should be read as an exception to the limitations.  In other words, boilerplate denunciations of obligations do not trump § 4.2(r)'s specific reference to the "limit[]" on the "formula for energy drinks."

We therefore affirm the district court's conclusion that NSL is bound by § 5.c of the Settlement Agreement by virtue of its incorporation into the Asset Purchase Agreement.  As a result, we do not reach Innovation's conditional argument that, if NSL is not bound by the Settlement Agreement, the tortious interference claim should be reinstated.

### 3.  Ambiguity of the Catch-All Clause

Defendants next challenge the district court's conclusion that whether betaine and alpha GPC are covered by the catch-all clause in the Choline Family definition (which prohibits use of listed chemicals' "equivalents in all forms, derivatives, constituents, and synthetic equivalents or substitutes") is ambiguous as a matter of law.

Defendants argue that the district court failed to construe the catch-all clause narrowly and against the party seeking restraint, as is required by Michigan law in contracts involving noncompete agreements.  Neither proposition requires a court to unilaterally disregard reasonable readings of a noncompete agreement.  To the contrary, "the meaning of an ambiguous contract is a question of fact that must be decided by the jury."  *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003).  This principle applies with equal strength in the context of noncompete agreements.  *See, e.g.*, *Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*,

662 F. App'x 400, 406–08 (6th Cir. 2016); *Pitsch Holding Co. v. Pitsch Enters., Inc.*, No. 315800, 2014 WL 3887186, at \*4–5 (Mich. Ct. App. Aug. 7, 2014) (per curiam).  We find no error in the district court's conclusion that the catch-all clause was ambiguous.

### 4. Enforceability and Reformation of the Settlement Agreement

We now reach the first of Innovation's arguments on appeal:  that the district court erred when it reformed the Settlement Agreement's restrictive covenants to last only three years instead of the original twenty.  According to Innovation, the district court should have applied a different test, the "rule of reason."

Defendants argue that Innovation waived its rule-of-reason argument as well as any objection to the three-year reformed duration of the agreement.  Both arguments are incorrect.  Innovation consistently argued that the district court should apply the rule of reason.  When a new Michigan Supreme Court case on the issue was decided, Innovation cited the new decision repeatedly for propositions directly related to the rule-of-reason analysis.  Innovation was not obliged to also move for reconsideration.  *See Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003) ("There is simply no rule or case law that requires litigants to move for reconsideration of an interlocutory ruling in order to avoid waiving a challenge to that ruling on appeal of a final decision.").

As to the purported concession about the duration of the reformed Agreement, the exchange with the district court was as follows:

| | |
|---|---|
| **THE COURT:** | . . . I know you told me that there were various reasons that you believe that the 20-year time limit was reasonable . . . . But as I asked Mr. Banowsky, do you agree that if the Court believed or found that that was too long and that it wasn't reasonable, that the next step would be to reform the contract in some way? |
| **MS. OLIJNYK:** | That would be appropriate, Your Honor, yes. . . . |
| **THE COURT:** | What do you think would be a reasonable amount of time? |
| **MS. OLIJNYK:** | Three to six years . . . . |

Though this concession might implicate a challenge to whether three years is an appropriate reformed duration, it does not waive the argument that the underlying premise is incorrect. We therefore consider the merits of Innovation's rule-of-reason argument.

### a. Standards Governing Noncompete Agreements

The district court analyzed the restrictive covenants in the Settlement Agreement under the standard laid out in Mich. Comp. Laws § 445.774a(1), which governs noncompete agreements in the employment context. *Innovation Ventures II*, 2015 WL 5679879, at *22. The court acknowledged the apparent discrepancy in applying an employment statute outside the employment context but explained that Michigan courts had used the framework in precisely that fashion. *Id.* For this proposition, the court cited a recent decision of a Michigan appellate court, *Liquid Manufacturing I*, 2014 WL 5408963, at *5, and a Sixth Circuit case, *Certified Restoration*, 511 F.3d at 546.

After the district court issued its decision, the Michigan Supreme Court reversed *Liquid Manufacturing I*, explaining that the statute governing employment noncompete agreements "does not address the proper framework for evaluating a noncompete agreement between businesses." *Liquid Mfg. II*, 885 N.W.2d at 873. The Court instructed that in the business-to-business context, a different statute governs and instructs courts to "give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason." *Id.* at 874 (quoting Mich. Comp. Laws § 445.784(2)). The Court clarified that *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539 (Mich. Ct. App. 2007), a case on which both the district court's decision and our decision in *Certified Restoration* had relied, was not "instructive" because it arose in the employment context. *Id.* at 873–74. The Court then remanded the case "to the trial court to consider whether the noncompete provisions . . . were reasonable under the proper standard." *Id.* at 874 n.18.

*Liquid Manufacturing II* makes clear that business-to-business noncompete agreements like the one at issue here must be "evaluated under the rule of reason," not by analogy to employment noncompete agreements that do not "address the proper framework." *Id.* at 873, 874.

Defendants argue against applying *Liquid Manufacturing II*'s straightforward guidance, claiming the case is inapplicable because Innovation seeks to enforce the Settlement Agreement against an individual and a corporation that was not a party to the original agreement. But in *Liquid Manufacturing II* itself, the plaintiffs sought enforcement against individuals who were party to the agreement. *Id.* at 875. And as we have already explained, *see supra* Part III.C.2, § 5.c of the Settlement Agreement is binding against NSL, whether or not NSL was originally a party to it.

Defendants also argue that even applying federal common law, the Settlement Agreement should be analyzed under the per se rule rather than the rule of reason. *Liquid Manufacturing II* does contemplate situations that apply "the doctrine of per se violations." *Id.* at 874 (quoting Mich. Comp. Laws § 445.784(2)). That doctrine, however, applies "only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive." *Food Lion, LLC v. Dean Foods Co.* (*In re Se. Milk Antitrust Litig.*), 739 F.3d 262, 273 (6th Cir. 2014) (quoting *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 343–44 (6th Cir. 2006)). "The classic examples are naked, horizontal restraints pertaining to prices or territories." *La. Wholesale Drug Co. v. Hoechst Marion Roussel, Inc.* (*In re Cardizem CD Antitrust Litig.*), 332 F.3d 896, 907 (6th Cir. 2003).

We will assume that the Settlement Agreement is a horizontal restraint because it "involve[s an] agreement[] among competitors at the same level of competition to restrain trade." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). But horizontality alone does not necessarily justify invocation of the per se rule. "[A]pplying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations." *Se. Milk Antitrust*, 739 F.3d at 273. These restrictive covenants do not fix prices or allocate territory, *Cardizem CD Antitrust*, 332 F.3d at 907, and Defendants have not made any other argument to explain why they necessarily fit into any other category of per se violation. Because the restrictive covenants do not "clearly and unquestionably fall[]" within the delineated categories of per se impermissible restraints, *Se. Milk Antitrust*, 739 F.3d at 273, application of a per se rule is not appropriate here.

b. *Burden of Proof*

Proper application of the rule of reason begins with determining which party has the burden of proof. Each party claims the burden lies with the other.

Prior to *Liquid Manufacturing II*, Michigan law was clear that "[t]he burden of demonstrating the validity of the agreement is on the party seeking enforcement." *Coates*, 741 N.W.2d at 545. Because Michigan courts were "reluctant to enforce [noncompete] contracts as being against the policy of the public in encouraging business competition," *Stoia v. Miskinis*, 298 N.W. 469, 474 (Mich. 1941), it stood to reason that a party seeking to enforce a noncompete agreement bore a heavier burden than a party enforcing a run-of-the-mill contract in which enforceability is presumed.

Though that likely remains the case for employment noncompete agreements, *Liquid Manufacturing II* upset that consensus with regard to noncompete agreements between businesses. The Michigan Supreme Court explained that *Coates*, the case the district court relied on and one the Defendants rely on now, is not "instructive" in the business-to-business context. 885 N.W.2d at 873–74. Instead, *Liquid Manufacturing II* approvingly cited *Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*, 221 F.3d 913 (6th Cir. 2000). 885 N.W. 2d at 874. In *Perceptron*, we explained that a defendant who contested enforcement of a noncompete agreement on the grounds that it was not a reasonable restraint on competition "was required to show a contract, combination, or conspiracy that affected interstate commerce and unreasonably restrained trade." 221 F.3d at 918. In other words, a defendant invoking the rule of reason as a defense to a breach of contract claim bore the burden of demonstrating that the restraint was invalid. By distinguishing *Coates* and citing *Perceptron* with approval, the Michigan Supreme Court indicated that the party alleging the restraint on trade bears the burden to show that a noncompete agreement between businesses is unreasonable.

The rule of reason provides the proper standard under which the restrictive covenants should be evaluated, and the burden of showing the existence of an unreasonable restraint on trade lies with Defendants. But on appeal, neither party has fully briefed application of the rule-of-reason test. This fact-intensive determination falls within the district court's area of expertise

and is better resolved there in the first instance.  We remand the Lead Case so that the parties may provide the detailed record information necessary for the court to apply the rule-of-reason framework.  *See Papas v. Buchwald Capital Advisors, LLC* (*In re Greektown Holdings, LLC*), 728 F.3d 567, 570 (6th Cir. 2013) (remanding where certain issues had "not been adequately briefed and argued by the parties and were not addressed below").

### c. Impact on the Secondary Case

As Innovation concedes, the claims in the Secondary Case are essentially duplicative of those in the Lead Case.  Below, both parties agreed that the resolution of the Lead Case rendered the Secondary Case "effectively moot" and so necessitated its dismissal.  *Innovation Ventures IV*, 2017 WL 4553429, at *1.  Innovation then appealed to protect against the eventuality that the district court's decisions in the Lead Case might be reversed—as we have now done.

We have allowed such a protective appeal in the past.  *See Dykstra v. Wayland Ford, Inc.*, 134 F. App'x 911, 917 (6th Cir. 2005) (consolidating two appeals where the second case had been determined on the basis of the first's preclusive effect, and reversing the second after concluding that the first had erred).  The Supreme Court has criticized a litigant who failed to pursue this course.  *See Reed v. Allen*, 286 U.S. 191, 198 (1932) ("If respondent, in addition to appealing from the decree, had appealed from the judgment, the appellate court, having both cases before it, might have afforded a remedy.").  *Wright & Miller* approves the tactic, explaining that the unfortunate result of a second judgment becoming conclusive despite relying on a prior judgment that is subsequently reversed "should always be avoided, whether by delaying further proceedings in the second action pending conclusion of the appeal in the first action [or] by a protective appeal in the second action that is held open pending determination of the appeal in the first action."  18A Wright & Miller, *supra*, § 4433.  Innovation's protective appeal is therefore well taken and, contrary to Defendants' urging, sanctions are not appropriate.

Defendants urge that we could dismiss portions of the Secondary Case on independent grounds related to the applicable statutes of limitations.  But the statute-of-limitations arguments were not considered by the district court, which decided the Secondary Case entirely on the basis

of the Lead Case's preclusive effect.  Because we reverse and remand the Lead Case, we likewise remand the Secondary Case.

### D.  Laches

We turn next to the issues that will determine the course of the suit upon remand:  the availability of a laches defense and the propriety of Innovation's three proposed damages methodologies.  Because both issues were decided below and were fully briefed and argued on appeal, we consider them here.

Innovation argues that it should have been granted summary judgment as to liability on its breach of contract claim because Defendants' laches defense—the only remaining barrier to judgment in its favor—fails as a matter of law.  Michigan law provides that

> [t]he doctrine of laches is triggered by the plaintiff's failure to do something that should have been done under the circumstances or failure to claim or enforce a right at the proper time.  However, the doctrine is only applicable in cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party.

*Dep't of Envtl. Quality v. Gomez*, 896 N.W.2d 39, 53 (Mich. Ct. App. 2016) (citations and internal quotation marks omitted).

Michigan courts presume that when a claim is brought within the statute of limitations, as this claim undisputedly was, the doctrine of laches does not apply.  The Michigan Supreme Court has summarily disposed of a laches defense on the basis that, "because [the plaintiff] filed this case within the six-year period of limitation, any delay in the filing of the complaint was presumptively reasonable, and the doctrine of laches is simply inapplicable."  *Mich. Educ. Emps. Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 152 (Mich. 1999); *see also City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001).

But more recent Michigan cases have considered the interplay of laches and statutes of limitations and explained when the presumption of reasonableness can be rebutted.  The Michigan Court of Appeals held in *Tenneco Inc. v. Amerisure Mutual Insurance Co.* that "[t]he application of laches can shorten, but never lengthen, the analogous period of limitations. . . . Thus, laches may bar a legal claim even if the statutory period of limitations has not yet

expired." 761 N.W.2d 846, 864 (Mich. Ct. App. 2008); *see also Gomez*, 896 N.W.2d at 54 ("[C]ourts may apply the doctrine of laches to bar actions at law even when the period of limitations established by the Legislature has not expired."). Defendants' laches defense is therefore not necessarily barred merely because the case was brought within the statute of limitations.

Turning to the merits, the parties dispute whether there was "an unexcused or unexplained delay in commencing" this suit. *Gomez*, 896 N.W.2d at 53. On the one hand, in September 2012, less than two weeks after this suit was filed, an Innovation officer stated that Innovation had "[r]ecently" discovered that NSL was using Choline Family ingredients. On the other hand, Innovation knew that Custom Nutrition was manufacturing at least one energy shot containing Choline Family ingredients ("Rock On") when the Settlement Agreement was executed; Rock On is the first product listed in the Agreement's appendix. Because NSL manufactured Rock On from its inception in 2009, this creates a dispute of material fact. A jury could reasonably infer that Innovation knew or should have known that NSL was manufacturing shots containing Choline Family ingredients almost three years before it filed suit.

A jury might also conclude that NSL was prejudiced by the delay, *see Gomez*, 896 N.W.2d at 53, because the liability that NSL faced increased with each violative energy shot sold and so with each day that Innovation delayed filing suit. Of course, NSL's decision to continue manufacturing shots containing Choline Family ingredients after the suit was filed could counsel against a finding of prejudice, because a jury could infer from that course of conduct that NSL would have run up the same potential damages regardless of when Innovation sued. But the available evidence does not require that conclusion. As the district court summarized it, "the entire point of Defendants' argument is that they would have reacted differently because they could have designed the products differently from the outset." *Innovation Ventures III*, 256 F. Supp. 3d at 704. Here, too, there is a dispute of material fact. The district court, therefore, did not err in deciding to submit these subsidiary factual disputes to a jury before making its ultimate determination on Defendants' laches defense.

Finally, Innovation invokes the unclean hands doctrine. Under Michigan law, "[a] party with unclean hands may not assert the equitable defense of laches." *Attorney Gen. v. PowerPick*

*Club*, 783 N.W.2d 515, 536 (Mich. Ct. App. 2010). The unclean hands doctrine allows a court to deny equitable relief when "the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*, 634 F. App'x 557, 567 (6th Cir. 2016) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995)). "In determining whether [a party] come[s] before this Court with clean hands, the primary factor to be considered is whether the [party] sought to mislead or deceive the other party." *Stachnik v. Winkel*, 230 N.W.2d 529, 534 (Mich. 1975). Defendants did not fraudulently induce Innovation to enter into the Settlement Agreement. Defendants subsequently breached the Agreement, but they had a good faith legal argument that they were not bound by the Agreement's terms. There is no evidence that Defendants misled Innovation about which energy shots they manufactured or what ingredients those energy shots contained. Innovation has failed to identify Michigan precedent supporting applying the unclean hands doctrine in these circumstances.

We affirm the district court's conclusion that disputes of material fact exist related to the issue of laches.

### E. Damages Calculation Methodologies

Innovation proposed three ways to calculate its damages: estimated lost profits based on Innovation's market share, an estimated reasonable royalty, and disgorgement. The district court determined that all three methods were impermissible but left open the possibility that Innovation could "still recover lost profits under a non-patent-infringement specific method of calculation." *Innovation Ventures III*, 256 F. Supp. 3d at 710–12 & n.8. Innovation instead allowed judgment to be entered in its favor for only nominal damages and thereby waived any damages theory other than the three presented before the district court. Innovation may recover damages only if we determine that one or more of these three theories is viable.

1.  Market-Share Based Calculation of Lost Profits

Innovation argues that it should be allowed to present to the jury an estimate of lost profits calculated by multiplying the number of units Defendants sold by Innovation's market share. This model essentially assumes that, if Defendants had not made these impermissible sales, Innovation, which sells 85% of the energy shots on the market, would have made 85% of those sales. The district court rejected this calculation as exclusive to patent cases. *Id.* at 710–11.

Under Michigan law, "[l]ost profits resulting from a breach of contract may be considered by a jury in determining damages." *Eastland Partners LP v. Village Green Mgmt. Co.* (*In re Brown*), 342 F.3d 620, 632 (6th Cir. 2003) (citing *Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 340 (Mich. Ct. App. 1980)). Permitting juries to estimate lost profits comports with the underlying principle of Michigan law that

> when, from the nature of the case, the amount of the damages can not be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.

*Health Call v. Atrium Home & Health Care Servs.*, 706 N.W.2d 843, 856 (Mich. Ct. App. 2005) (quoting *Allison v. Chandler*, 11 Mich. 542, 555–56 (1863)). While "lost profits must be proven with a reasonable degree of certainty and cannot be based solely on conjecture and speculation," *In re Brown*, 342 F.3d at 632, "the law permits some level of uncertainty to be resolved by the trier of fact," *Health Call*, 706 N.W.2d at 856. *See also* 24 Richard A. Lord, *Williston on Contracts* § 64:10 (4th ed. Supp. 2018) (describing the shift from the historic practice of forbidding the award of lost profits as remote or speculative to the current practice of allowing for estimated lost profits to avoid the iniquity of depriving the plaintiff of any recovery).

At least one Michigan court has determined that testimony related to market share can help quantify lost profits with sufficient certainty. *See Fabbrini Family Foods, Inc. v. United Canning Corp.*, 280 N.W.2d 877, 880 (Mich. Ct. App. 1979) (per curiam) (explaining that an accountant's proof of lost profits was sufficiently concrete where he described the overall dip in

gross profits and explained "that the corporation's share of the market dropped from 85% to 55%"); *see also Lakestates Workplace Sols., Inc. v. Spradlin* (*In re Spradlin*), Nos. 98-20611/2065, 2000 Bankr. LEXIS 1968, at *18 (Bankr. E.D. Mich. May 15, 2000) (citing *Fabbrini* to support the conclusion that "[l]ost profits can be quantified based on loss of market share"); Jill M. Wheaton, *Proving and Defending Commercial Damages Claims*, *in Michigan Law of Damages and Other Remedies* 301, 307 (Barbara A. Patek et al. eds., 3d. ed. Supp. 2014). To be sure, using loss of market share alongside other data to quantify lost profits is not the same as relying entirely on a stagnant market share for the same task. But forbidding the submission of market-share based estimates to a jury as a matter of law runs afoul of *Fabbrini* and impermissibly limits the scope of the jury's inquiry.

We conclude here only that this theory of relief is available for Innovation to pursue. Upon remand, Innovation may introduce testimony that uses market share to quantify its lost profits. Defendants may then submit rebuttal evidence concerning the weaknesses of this specific calculation. Only then can the determination be made whether all the evidence proves the amount of lost profits "with a reasonable degree of certainty." *In re Brown*, 342 F.3d at 632.

### 2. Reasonable Royalty

Innovation next argues that it should be permitted to present the jury with evidence of damages based on a calculated reasonable royalty.

Reasonable royalties are an accepted method of calculating damages in patent infringement and misappropriation of trade secret cases. *See* 35 U.S.C. § 284 ("[T]he court shall award the claimant damages adequate to compensate for the [patent] infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ."); Mich. Comp. Laws § 445.1904 ("[T]he damages caused by misappropriation [of trade secrets] may be measured by imposition of liability for a reasonable royalty . . . ."). Innovation does not, however, cite any Michigan cases, federal cases applying Michigan law, or even secondary sources that contemplate using a reasonable royalty to calculate damages in breach of contract cases.

Instead, Innovation points to a handful of out-of-state and out-of-circuit cases. We begin with the lone appellate case in Innovation's list, *Celeritas Technologies, Ltd. v. Rockwell International Corp.*, 150 F.3d 1354 (Fed. Cir. 1998). In *Celeritas*, a patent holder "in the business of licensing its technology" met with a manufacturer to demonstrate its proprietary technology. *Id.* at 1356, 1359. The parties entered into a non-disclosure agreement (NDA) covering the subject matter of the meeting. *Id.* at 1357. The manufacturer decided not to license the technology and, instead, "assigned the same engineers who had learned of Celeritas's technology under the NDA to work on" a project to develop the same technology. *Id.* Celeritas sued for breach of the NDA, misappropriation of trade secrets, and patent infringement. *Id.* The jury awarded the same damages figure on both the patent and contract claims, calculated based on a hypothetical license fee. *Id.* On appeal, the patent was deemed invalid because it had been anticipated by a published article. *Id.* at 1361. But the Federal Circuit determined that Celeritas could nonetheless recover a reasonable royalty as damages for the manufacturer's breach of the NDA: "To compensate Celeritas for the breach, the jury properly determined the license fee Rockwell would have paid had it not breached the agreement." *Id.* at 1359.

In this case, unlike in *Celeritas*, there are no patent infringement or misappropriation claims. The Settlement Agreement was not part of licensing negotiations. And, as Innovation's own expert stated in his report, "Innovation Ventures has no history of licensing its intellectual property to any competitor." So even assuming Michigan law might allow for assessment of royalty-based damages in certain, unusual breach of contract cases, the circumstances that rendered that assessment reasonable in *Celeritas* are not present here.

The remaining cases—all from out-of-circuit district courts, and largely unpublished— are similarly inapposite. In some, the contract claim was paired with a misappropriation or patent infringement claim, so the court simply allowed the use of the reasonable royalty methodology across both types of claims, or after one had been dismissed. *See Veritas Operating Corp. v. Microsoft Corp.*, No. C06-0703, 2008 WL 7404617, at *2–3 (W.D. Wash. Feb. 26, 2008); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 73 F. Supp. 2d 997, 999, 1007–08 (N.D. Iowa 1999). In others, the experts worked from established royalty rates between the parties. *See Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, No. CV 11-1506, 2017

WL 3668757, at *8 (D. Minn. Aug. 23, 2017) (allowing expert testimony that a royalty rate between two and five percent was reasonable where the parties had previously agreed upon a two-percent royalty, *see Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818 F.3d 356, 359 (8th Cir. 2016)); *Agrigenetics, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, No. 1:08-CV-802, 2010 WL 4683936, at *4 (S.D. Ind. Nov. 10, 2010) (permitting expert testimony that focused exclusively on the "established royalty").[4]

In sum, no controlling authority from either this court or any Michigan court holds that damages in the form of a reasonable royalty may be assessed in a breach of contract case. Even the non-binding authority depended on circumstances not present here. An estimated reasonable royalty is not an appropriate theory for proof of damages in this case.

### 3. Disgorgement

Finally, Innovation argues that, pursuant to § 5.d of the Settlement Agreement, it should be allowed to seek disgorgement of Defendants' proceeds from selling energy shots that violated the Choline Family restrictions. We therefore must decide whether Defendant NSL is bound by § 5.d because it is incorporated by reference into either § 5.c of the Settlement Agreement (which, for the reasons explained above, *see* Part II.C.2, binds NSL) or the Asset Purchase Agreement (to which NSL is a party).[5]

First, we ask whether § 5.c.i incorporates § 5.d. Michigan courts, like their Texas counterparts, distinguish between contractual terms that merely "mention" another document and those that are "made for the purpose of making such writing a part of the contract." *Forge v. Smith*, 580 N.W.2d 876, 881 & n.21 (Mich. 1998) (citation omitted). In so doing, courts "must look for the party's intent within the contract." *Id.* at 881.

---

[4]The remaining case holds only that "[l]ost profits and reasonable royalties are specific allegations of damage that are sufficient to satisfy the requirement to plead actual and appreciable damages under California breach of contract law." *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119, 2014 WL 234218, at *5 (N.D. Cal. Jan. 21, 2014) (internal quotation marks omitted). Even if it were relevant to our determination about Michigan law, this case does not reach the issue of whether a jury can base its damages calculation on a reasonable royalty.

[5]For the reasons explained above, *see supra* Part II.C.1, the Settlement Agreement does not bind Defendant Jones in his personal capacity. Because Innovation does not argue that the Asset Purchase Agreement binds Jones in his personal capacity, Innovation may not seek disgorgement from Jones.

The Choline Family restrictions are found in § 5.c.i of the Settlement Agreement. The key sentence provides that "[n]o Energy Liquid shall contain anything in the Choline Family (defined below) (subject to the Sell-Through Period described in Subsection 5.d. below)." The cross-referenced subsection, § 5.d, titled "Sell-Through Period," has two key terms. First, it provides for three- and six-month grace periods in which Custom Nutrition can continue to produce and sell, respectively, energy shots containing Choline Family ingredients. Second, it provides for damages: "Remedy for violation is injunctive relief and disgorgement of proceeds plus provable damages, attorneys' fees and indemnification for each such violation."

No Michigan cases have been cited involving the situation where one clause of a contract incorporates another clause by reference. Even if we assume that clause-by-clause incorporation is possible, § 5.c.i refers to the "Sell-Through Period *described* in Subsection 5.d" (emphasis added) rather than § 5.d in its entirety. The limited reference points more naturally to the grace period in § 5.d than to its damages language.

We turn next to Innovation's argument that the Asset Purchase Agreement incorporates § 5.d. Innovation asserts, without analysis or citation, that "[s]ince §5.d. (setting forth the formula-restriction grace period and remedies for breach) is part and parcel of §5.c.i., there is no way to isolate §5.c. from §5.d." We disagree. Section 5.c describes the prohibited conduct, and § 5.d describes the resulting penalty; these two provisions are logically distinct. The Asset Purchase Agreement describes limitations on "the formula for energy drinks," which, as explained above, most naturally refers to the ingredient-specific restrictive covenants in § 5.c that would change the formula itself. The proposed remedy, on the other hand, does not "limit[]" the formula.

We therefore affirm the district court's conclusion that Innovation may not seek disgorgement of Defendants' proceeds.

**III.  CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is **DENIED**; the district court's conclusions as to personal jurisdiction, Defendants' antitrust counterclaim, whether NSL is bound by the Settlement Agreement, the ambiguity of the catch-all clause, laches, reasonable royalty, and disgorgement are **AFFIRMED**; and the district court's conclusions as to whether Jones is bound by the Settlement Agreement, the enforceability and reformation of the restrictive covenant, and lost profits are **REVERSED**.  The district court's dismissal of the Secondary Case based on preclusion is therefore also **REVERSED**.  We **REMAND** both the Lead and the Secondary Case for further proceedings consistent with this opinion.