**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1729**

SPRINT NEXTEL CORPORATION; SPRINT COMMUNICATIONS COMPANY L.P.,

Plaintiffs – Appellees,

v.

WIRELESS BUYBACKS HOLDINGS, LLC; WIRELESS BUYBACKS, LLC,

Defendants – Appellants,

and

SIMPLE CELL INC.; VAUGHN SOLUTIONS, LLC; HALO BRANDED SOLUTIONS, INC.; MARSHA LAVAIGE; MELISSA LAVAIGE; KEVIN A. LOWE; CHRISTOPHER E. METZGER; KEVIN EDWARD SALKELD; BRENDAN T. SKELLY; SHANNON A. SKELLY; NICHOLAS F. SKELLY; BRETT VAUGHN,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:13-cv-00617-CCB)

Argued: May 9, 2019                                    Decided: September 5, 2019

Before DIAZ, FLOYD, and RICHARDSON, Circuit Judges.

Vacated and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Diaz and Judge Floyd joined.

**ARGUED:** Charles Randolph Price, TANDEM LEGAL GROUP, LLC, Washington, D.C., for Appellants. Jay E. Heidrick, POLSINELLI PC, Kansas City, Missouri, for Appellees. **ON BRIEF:** Russell S. Jones, Jr., John M. Challis, POLSINELLI PC, Kansas City, Missouri, for Appellees.

RICHARDSON, Circuit Judge:

Sprint is a cell-phone service provider.[1]  Besides providing cellular service, it also sells phones to its customers.  This includes offering "upgraded" phones at steep discounts, typically in exchange for customers renewing their contracts.  The discounts are so steep that Sprint winds up selling the phones for less than they can command on the second-hand market.  Several businesses across the country have sought to profit from this price differential by engaging in arbitrage:  they buy "upgraded" phones from customers and then resell them at higher prices.

Sprint thinks that these arbitrageurs are interfering with its business and has brought lawsuits across the country to stop them.  This is one such case.  While Sprint brought several claims against multiple defendants, the only remaining claim on appeal is one for tortious interference against Wireless Buybacks, one such arbitrageur.  Sprint asserts that its written contract with customers categorically prohibits them from reselling their phones, and that Wireless Buybacks has wrongfully induced customers to do just that.  Wireless Buybacks argues that the contract is ambiguous at best regarding when customers may sell their phones.

The district court found that the contract unambiguously barred resale and granted partial summary judgment for Sprint.  We disagree.  We therefore vacate the relevant

---

[1] For simplicity's sake, we use "Sprint" to refer to plaintiffs Sprint Nextel Corporation and Sprint Communications Company, L.P., and "Wireless Buybacks" to refer to defendants Wireless Buybacks Holdings, LLC and Wireless Buybacks, LLC.

portion of the district court's summary-judgment order and remand for further proceedings.

## I.

## A.

Sprint, like other cell carriers, offers customers upgraded phones at heavily discounted prices. For example, Sprint has offered new iPhones to customers for as little as $199. *See* J.A. 220. This is far below what Sprint pays for the phones (much less the retail price); it claims that these price discounts amount to over $400 per phone on average. J.A. 725. In exchange for these discounts, Sprint requires customers to sign up for fixed-term contracts, often lasting as long as two years. Upgraded phones thus serve as a loss-leader: Sprint sells them at heavily discounted prices to entice new customers to sign up and existing customers to renew their contracts. Sprint ultimately profits because the earnings from these service contracts more than offset the discounts on the phones. In this way, upgraded phones are like the "doorbuster" deals that brick-and-mortar retailers use to get customers in the door.

Wireless Buybacks is one of several businesses that has tried to turn upgraded phones into profits. Its business model was simple arbitrage: buy low and sell high. Wireless Buybacks explained the details in a promotional video aimed at commercial customers. These customers purchase multiple lines of cell service for use by their employees but do not always take advantage of upgrade offers from their service providers. Yet they are effectively paying for these unused upgrades through their regular service charges. Wireless Buybacks offered businesses a way to "leverage"

4

unused upgrades and "turn [them] into cash." When contacted by a business, Wireless Buybacks did the following: (1) performed a free analysis of the business's account with its cell-phone carrier; (2) explained to the business how many upgrades they had available and how much money Wireless Buybacks would pay for them; (3) gave the business instructions on how to order the upgraded phones from the carrier; and (4) once the phones arrived, bought them from the business, paying cash. The video said that there was "really no catch," except that cell carriers expect businesses to renew their service contracts in exchange for the upgraded phones. The video also explained how Wireless Buybacks made money: by reselling the phones at higher prices.[2]

Sprint claims that it is harmed by this practice of reselling phones in several ways. Most obviously, Sprint loses money when it sells upgraded phones to customers who would otherwise maintain their existing service without ordering upgrades. Sprint also advances a subtler theory of harm. Customers who use new phones with the latest technology get better service. When customers resell their upgraded phones, that means they are continuing to use old phones—leading to lower customer satisfaction. In some cases, Sprint claims, customers cancel their service as a result.

---

[2] The promotional video is filed under seal as Volume 4 of the Joint Appendix. We take this opportunity to note that an excessive portion of the summary-judgment record is under seal. Summary-judgment materials are subject to the public's right of access to judicial records under the First Amendment. *Doe v. Public Citizen*, 749 F.3d 246, 266–67 (4th Cir. 2014). The video is just one example of material in the record that is under seal with no real justification, much less a compelling one as the law requires. We hope the district court will address this issue on remand.

Sprint's theory of liability is contractual.  It claims that its customers promised not to resell the phones when they agreed to Sprint's terms and conditions of service, the written contract here.  Businesses like Wireless Buybacks, Sprint asserts, tortiously interfered with that contractual relationship by inducing customers to resell upgraded phones in violation of the terms and conditions.

The contract allegedly prohibits reselling phones in these provisions:

- "**Nature of our Service.**  Our rate plans, customer devices, services and features are not for resale and are intended for reasonable and non-continuous use by a person using a device on Sprint's networks."  J.A. 741.

- "**Basic Definitions**  In this document: . . . (3) 'Device' means any phone, aircard, mobile broadband device, any other device, accessory, or other product that we provide you, we sell to you, or is active on your account with us; and (4) 'Service' means Sprint-branded or Nextel-branded offers, rate plans, options, wireless services, billing services, applications, programs, products, or Devices on your account with us.  'Service(s)' also includes any other product or service that we offer or provide to you that references these General Terms and Conditions of Service ('Ts&Cs')."  J.A. 744.

- "**Restrictions On Using Services**  . . . .  You cannot in any manner resell the Services to another party."  J.A. 746.

The "Nature of our Service" clause, Sprint argues, unambiguously prohibits the resale of any "customer devices," which include phones.  And so too does the "Restrictions On Using Services" clause because the definition of "Services," in Sprint's view, unambiguously includes upgraded phones.  Or at least, the contract prohibits resale during the two-year renewal period that follows an upgrade—Sprint has appeared, at times, to advance this narrower proposition.  *See* J.A. 894 (Sprint employee declaration

stating that the resale prohibition no longer applies "*after* the customer has completely satisfied its financial obligations with Sprint"). Wireless Buybacks disagrees and argues that customers who own their phones outright are free to resell them.

There are some phones, however, that both Sprint and Wireless Buybacks agree customers cannot resell. They agree that customers cannot resell phones that are active on Sprint's network. They also agree that customers cannot resell phones that Sprint has provided pursuant to lease and installment-billing agreements. The agreement governing leased phones tells customers that they cannot resell the phones "unless and until you exercise your purchase option." J.A. 868. The installment-billing agreement gives Sprint a security interest in the phones and forbids resale "while the Goods remain subject to our security interest." J.A. 869. The parties therefore agree that, at least until these phones are fully owned by the customer, they cannot be resold.

### B.

Sprint filed this lawsuit in 2013 against Wireless Buybacks and other companies that bought and sold upgraded phones, as well as individuals who owned and worked for those companies. The complaint asserted several different causes of action, including claims for tortious interference, fraud, conversion, and trademark infringement. The district court rejected the fraud claims on a motion to dismiss but permitted Sprint's other claims to go forward. Over time, many of the defendants settled with Sprint, and some consented to permanent injunctions forbidding them from reselling Sprint phones. *See, e.g.*, J.A. 150–56. Wireless Buybacks did not settle.

After discovery, Sprint moved for partial summary judgment,[3] and the district court granted the motion in part. As is relevant for our purposes, it held that Wireless Buybacks was liable for tortious interference with contract. The court reasoned, first, that Sprint's contract with its customers unambiguously prohibited the resale of all Sprint phones. The district court then concluded that Wireless Buybacks' business involved inducing Sprint customers to resell their phones, even though it knew that Sprint's contract prohibited resale. Finally, the court held that Sprint was harmed as a result. The court therefore found Wireless Buybacks liable for tortious interference.

The district court's order did not resolve the amount of Sprint's damages, and the parties began to prepare for a trial on that issue. They soon ran into disagreement on how to implement the district court's order. In Wireless Buybacks' view, Sprint had to make an individualized showing of unlawful inducement for each customer from whom Wireless Buybacks had bought a Sprint phone. In Sprint's view, it merely had to identify how many Sprint phones Wireless Buybacks acquired and prove how much harm it suffered as a result. The parties resolved this dispute among themselves, stipulating that, "[t]o establish damages at trial, Sprint need only show the amount it has been damaged and is not again required to show that [Wireless Buybacks] induced the breach of the Terms & Conditions between Sprint and every customer." J.A. 642.

---

[3] Three individual defendants who were officers and employees of Wireless Buybacks also cross-moved for partial summary judgment, seeking dismissal of certain claims against them. Wireless Buybacks itself, however, did not file a cross-motion.

Ultimately, the parties decided to avoid the cost and expense of trial by way of a stipulated judgment. The judgment explained that, "[i]n order to facilitate appeal of the Court's Summary Judgment Order without the need for trial, Defendants consent to damages in the amount of $26,900,000 for Sprint's tortious interference claim." J.A. 678. A footnote added: "Plaintiffs and Defendants both expressly reserve all rights to appeal the Court's rulings regarding liability, and any prior rulings in this case. The Parties further reserve the right, as may be allowed by law, to contest the amount of damages in the event that Defendants' appeal on liability is successful." J.A. 678 n.1. Accordingly, the judgment awarded Sprint $26.9 million in damages for tortious interference. The judgment also (1) entered judgment for Sprint on Wireless Buybacks' counterclaims, (2) dismissed all of Sprint's other claims against Wireless Buybacks with prejudice, and (3) dismissed all of Sprint's claims against the three remaining individual defendants (all officers and employees of Wireless Buybacks) with prejudice.

Wireless Buybacks timely appeals from the district court's order awarding Sprint partial summary judgment. J.A. 680.

## II.

We begin by examining our appellate jurisdiction. With a few exceptions, we generally may review district-court judgments only once they have become "final." 28 U.S.C. § 1291. The exceptions do not apply here, and so our jurisdiction turns on whether the stipulated judgment entered by the district court was, in fact, final. There are various reasons why a district-court order might not be considered final; for example, orders that dispose of only some of the claims in the lawsuit typically are not final and

9

appealable.  A different set of finality problems can arise when civil actions are disposed of by the parties' consent.  Appeals courts generally do not treat private settlements as reviewable final judgments (again, with exceptions; for example, we sometimes review settlements of class actions and other cases in which individual parties represent someone other than just themselves).

Our finality concerns here arise from the fact that the parties seek appellate review of a stipulated judgment entered at their request.  While both sides agree that appellate jurisdiction exists, we must assure ourselves of jurisdiction regardless of their wishes.  Because the judgment below bears at least a passing similarity to one the Sixth Circuit found insufficiently final to confer appellate jurisdiction in *Board of Trustees v. Humbert*, 884 F.3d 624 (6th Cir. 2018), we ordered supplemental briefing on the jurisdiction question.  Upon review, however, we conclude that this case is distinguishable from *Humbert* and that we have appellate jurisdiction.

The Supreme Court recently addressed § 1291's finality requirement in *Microsoft v. Baker*, 137 S. Ct. 1702 (2017), a class action.  In that case, the district court denied class certification.  The plaintiffs then voluntarily dismissed their individual claims "with prejudice," but with the caveat that they could resume their individual claims if the class-certification decision were reversed.  *Id.* at 1710–11.  Emphasizing that "'finality is to be given a practical rather than a technical construction,'" the Court found no appellate jurisdiction because the plaintiffs' "dismissal device subverts the final-judgment rule." *Id.* at 1712–13 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171 (1974)).  The Court noted that this device "invites protracted litigation and piecemeal appeals" and

permits plaintiffs to turn any class-certification decision they do not like into a final, appealable order. *Id.* at 1713–15. The Court also noted the "one-sidedness" of this approach, which permits only plaintiffs, not defendants, to appeal class-certification decisions. *Id.* at 1715.

In *Humbert*, the Sixth Circuit extended *Microsoft*'s reasoning to a judgment stipulating to damages. The district court had ruled for the plaintiff at summary judgment but had not yet determined damages. 884 F.3d at 625. The parties then agreed to a stipulated judgment that awarded the plaintiff $45,000 in damages, while explaining that the parties would be free to relitigate "the amount of the damages to which the Plaintiffs are entitled to recover" if the appeals court remanded the case. *Id.* (quoting judgment). The Sixth Circuit concluded that the judgment was not a final, appealable order because it did "not even conclusively resolve the single issue that it purport[ed] to resolve": the plaintiff's damages. *Id.* at 626. The court also observed that, as in *Microsoft*, it was not enough that affirming would produce a final judgment, because "[w]hat matters is that the 'potential for piecemeal litigation' remains if we do anything but affirm." *Id.* (quoting *Microsoft*, 137 S. Ct. at 1713).

The Sixth Circuit has since distinguished *Humbert* in *Innovation Ventures, LLC v. Nutrition Science Laboratories, LLC*, 912 F.3d 316 (6th Cir. 2018). In that case, the district court reached two key rulings on summary judgment: (1) the plaintiff would be entitled to partial summary judgment on liability but for a genuine dispute over the defendant's laches defense, and (2) the plaintiff's proposed damages methodology was impermissible. *Id.* at 325–26. The parties then (1) stipulated that the defendant's laches

11

defense was not a bar to a judgment for only nominal damages and (2) agreed to the entry of a judgment awarding one dollar of nominal damages, on the understanding that the plaintiff could prove only nominal damages without the damages methodology that had been rejected by the district court. *See id.* at 326. This resolved all outstanding questions about damages and liability, and the Sixth Circuit found the judgment final. The court explained that the parties may "stipulate to issues or theories that they are electing not to pursue," provided that their stipulation remains binding on remand. *Id.* at 330. The Sixth Circuit confirmed that, on remand, the parties would in fact continue to be bound by their agreements: the defendant could not argue laches to resist a judgment for only nominal damages, and the plaintiff could not obtain more than nominal damages unless it prevailed on the damages methodology the district court had rejected. *See id.* at 332, 344. That distinguished the case from *Microsoft* and *Humbert*, which involved the "conditional dismissal of unresolved claims [or issues], in which the party reserves the right to reinstate those claims [or issues]." *Id.* at 330 (alterations in original) (quoting *Page Plus of Atlanta, Inc. v. Owl Wireless, LLC*, 733 F.3d 658, 659 (6th Cir. 2013)).

The lesson of these cases is that parties may not gin up appellate jurisdiction by entering into a stipulation that is directly conditioned on the outcome of an appeal. For example, the parties may not "stipulate" to the amount of damages but provide that their agreement is void on remand if the court of appeals does anything but affirm. Such an agreement is not really a stipulation at all. A true stipulation is a conclusive resolution of a factual issue that is binding for the rest of the litigation; it does not evaporate after appeal. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 677–78 (2010) ("But

12

factual stipulations are formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission is conclusive in the case." (cleaned up)). Courts usually let parties out of their stipulations only under certain limited conditions. *See generally* 22A CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5194.3 (2d ed.) (discussing circumstances where courts have relieved parties from stipulations).

But parties often enter into stipulations that, while more durable than the one in *Humbert*, are rationally conditioned on some other factual or legal issue, independently of which particular court resolves it.[4] Cases are legion where the parties stipulate to a set amount of damages *if* liability is established. Of course, the real-world effect of such a stipulation may turn *indirectly* on the result of an appeal: if the appellate court reverses and the defendant is found not liable, then the stipulation ultimately has no practical consequence. Even so, the courts of appeals have never hesitated to review district courts' rulings on liability in such cases. *See, e.g.*, *Marshall v. Emersons Ltd.*, 593 F.2d 565, 567 (4th Cir. 1979); *Ardente v. Standard Fire Ins. Co.*, 744 F.3d 815, 817 (1st Cir. 2014); *Royal & Sun All. Ins., PLC v. Int'l Mgmt. Servs. Co.*, 703 F.3d 604, 607 (2d Cir. 2013); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 371 (5th Cir. 2006). That is because our justice system prizes the private resolution of disputes, either

---

[4] The stipulation in *Innovation Ventures* was conditional in this sense: the defendant stipulated that, *if* the judgment was for only nominal damages, then the defense of laches was unavailable (a condition that apparently had some colorable support in Michigan law). *See* 912 F.3d at 326.

13

in whole or in part. Such agreements allow the parties to manage the cost and risk of litigation, while also reducing the strain on the courts. We therefore permit the parties to stipulate to some issues and have the trial court resolve the rest, and we do not impose penalties—such as loss of the right to appeal the issues the district court actually decided—for doing so.

We see no reason why a valid stipulation on damages cannot turn on the scope, as opposed to the bare existence, of liability. Such stipulations are quite sensible as a matter of legal doctrine and practice. As a doctrinal matter, the amount of damages will almost always turn on the scope of liability.[5] And as a practical matter, stipulating to what damages would be if the scope of liability is broad may avoid protracted, complex proceedings to calculate damages. *Cf. Microsoft*, 137 S. Ct. at 1712 (recognizing that finality under Section 1291 is to be given a practical construction). The point is that such a stipulation must be a binding one, not one that vanishes as soon as we vacate the district court's order on liability.

We conclude that the parties here entered into a valid stipulation providing a damages amount predicated on the scope of liability.

---

[5] We would be more skeptical if the stipulation did not make sense as a doctrinal matter. For example, the plaintiff in *Microsoft* surely could not get around the Supreme Court's holding by "stipulating" that its individual claims failed *if* class certification was denied. Such a condition would make no sense: the legal viability of an individual claim does not turn on class certification (although the opposite is sometimes true). But we do not have that problem here, because it is perfectly logical—indeed, virtually inevitable—that the amount of damages will turn on the scope of liability.

The stipulated final judgment stated that "Defendants consent to damages in the amount of $26,900,000 for Sprint's tortious interference claim." J.A. 678. A footnote added: "Plaintiffs and Defendants both expressly reserve all rights to appeal the Court's rulings regarding liability, and any prior rulings in this case. The Parties further reserve the right, as may be allowed by law, to contest the amount of damages in the event that Defendants' appeal on liability is successful." J.A. 678 n.1.

We asked for supplemental briefing because the judgment seems to say that the parties' damages stipulation, like the one in *Humbert*, is conditioned on the outcome of this appeal. In their briefs, both parties disavow such an interpretation of the judgment. They agree that the qualifying phrase "as may be allowed by law" means that they cannot escape from their stipulation simply because we reverse or vacate the district court's ruling on liability. While the parties may not create appellate jurisdiction by consent, we may of course defer to their shared understanding of the stipulated judgment. Here, the phrase "as may be allowed by law" is arguably ambiguous: it clearly contemplates that the parties can escape their agreement on damages under some circumstances, leaving open what those circumstances are. Deferring to the parties, we will interpret "as may be allowed by law" to contemplate only those narrow circumstances when a party can be relieved from a stipulation. *Cf. Waugh Chapel South, LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 359 (4th Cir. 2013) (reinterpreting voluntary dismissal "without prejudice to refiling in any other proceeding" as a dismissal

with prejudice, in order to "police[] the boundaries of our appellate jurisdiction without punishing the litigants in this appeal").[6]

The parties thus agree that the judgment reflects a damages stipulation that will remain binding on remand. They less clearly agree on the content of this stipulation. Sprint has asserted that the damages stipulation turns only on the bare fact of liability, meaning that Wireless Buybacks is on the hook for the full $26.9 million once any liability for tortious interference is established. In context, however, we think the judgment is best interpreted to reflect a stipulation of what Sprint's damages are if Wireless Buybacks' scope of liability is as the district court determined on summary judgment.

This case is about four categories of phones: (1) leased phones, where those customers had not exercised their purchase option; (2) installment-purchase phones, where the customers had not paid off the phones in full; (3) other phones that were active on Sprint's network; and (4) phones that customers had bought outright from Sprint but that were not active on Sprint's network. Sprint argues that its customers were forbidden by contract from reselling all four categories of phones. Both before the district court and on appeal, Wireless Buybacks has conceded the point for categories (1), (2), and (3). It disagrees with Sprint on category (4), insisting that customers had the contractual right to resell such phones.

---

[6] Admittedly, we might reach a different result without the parties' agreement on this point. Litigants would do well to take greater care in crafting such judgments.

16

The district court ruled for Sprint on the category (4) phones. The parties then prepared for a trial on damages. The key questions at such a trial would naturally be how many phones Wireless Buybacks wrongfully induced customers to sell (a number Sprint claims is well over 100,000) and how much harm Sprint suffered as a result. Sprint would bear the burden of proof on these issues, which would presumably require expert testimony. And Wireless Buybacks would have to counter this evidence, likely through its own experts. All that would have been an expensive task for both sides and consumed significant judicial resources. The parties could relieve themselves and the court from these burdens by agreeing what the damages would be *if* Wireless Buybacks were, in fact, liable for inducing the resale of all four categories of phones. And we think the judgment is best interpreted to reflect just such a stipulation, at least once we have set aside the interpretation both parties have disavowed.

This stipulation is real and will remain binding on remand (unless, as noted above, there is some lawful basis for relieving the parties from the stipulation). If Wireless Buybacks is ultimately found liable for all four categories of phones, then damages will be at the stipulated amount. This effectively caps Sprint's damages. It also limits certain arguments Wireless Buybacks wants to make. Wireless Buybacks argues that Sprint has improperly sought damages for phones that were not directly obtained from Sprint customers, but bought from reputable wholesalers. Yet the district court did not address such phones in its summary-judgment order; it only considered phones that Wireless Buybacks induced Sprint customers to sell. While Wireless Buybacks had the right to contest whether Sprint had correctly identified these phones as falling within the scope of

17

the district court's liability ruling, it gave up that right by stipulating to damages. Wireless Buybacks can revisit that issue only if it is ultimately found not liable for the category (4) phones.

Sprint claimed at oral argument that it should get the full stipulated damages amount even if Wireless Buybacks is found liable for phones in categories (1) through (3) but not (4). This reading of the stipulation simply is not reasonable in the context of this litigation. The primary issue at summary judgment—both before the district court and before us—concerns the category (4) phones. Sprint's interpretation would effectively leave Wireless Buybacks unable to appeal the district court's liability ruling, rendering the parties' stipulation nonsensical. We therefore reject this argument.

III.

We now turn to Sprint's tortious-interference claim. The main issue in this appeal is whether Sprint's contract with its customers forbade them from reselling phones owned by customers outright but not active on Sprint's network. The parties agree that this issue is governed by Maryland law, which follows an "objective" approach to contract interpretation. *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013). Under this approach, the court must first look to the written language of the contract to determine whether it is "susceptible of a clear, unambiguous and definite understanding." *Id.* (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 630 (Md. 2001)). In making this determination, the court must consider the contract "in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the

18

language of the writing unless no other course can be sensibly and reasonably followed." *Id.* at 233 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)). If the contract is unambiguous, then the court construes it as a matter of law. *Id.* at 232. If the contract is ambiguous—that is, "susceptible to multiple interpretations by a reasonable person"—the court turns to extrinsic evidence to discern what the parties intended in adopting the contract. *Id.* at 233–34.

The district court agreed with Sprint that, based on several terms of the contract, it unambiguously prohibited Sprint customers from reselling all Sprint phones. Wireless Buybacks argues that the contract is ambiguous, relying on the Tenth Circuit's decision in *Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524 (10th Cir. 2016), which interpreted the same contractual language before us. Whether the contract is ambiguous presents an issue of law that we review de novo. Based on our review, we agree with Wireless Buybacks that the contract is ambiguous.

A.

Sprint first relies on the "Nature of our Service" clause, which states: "Our rate plans, customer devices, services and features are not for resale and are intended for reasonable and non-continuous use by a person using a device on Sprint's networks." J.A. 741. We think that this language, read in context, is susceptible of a clear and definite interpretation: it is a background statement of intent, not an enforceable promise not to resell Sprint phones.

Contracts often contain recitals: provisions that do not make binding promises but merely recite background information about factual context or the parties' intentions.

19

Maryland law recognizes the general principle that such recitals are not binding and, while they may aid the court in interpreting the contract's operative terms, cannot displace or supplement operative terms that are clear. *See Pulaski v. Riland*, 86 A.2d 907, 910 (Md. 1952); *Cty. Comm'rs of Charles Cty. v. Panda-Brandywine, L.P.*, 663 F. Supp. 2d 424, 430 (D. Md. 2009), *aff'd*, 401 F. App'x 831 (4th Cir. 2010). While such recitals are often set forth at the beginning of the agreement in "whereas" clauses, that is not always the case. *See, e.g.*, *Aramony v. United Way of America*, 254 F.3d 403, 406, 413 (2d Cir. 2001) (concluding section titled "Purpose of the Plan" in ERISA plan document consisted of nonbinding recitals).

Here, several factors convince us that the "Nature of the Service" clause is a recital providing background information about the parties' intent. The first is its language. The clause says that Sprint's devices "*are* not for resale" and "*are intended* for reasonable and non-continuous use." J.A. 741 (emphases added). This is the language of description, not promise. The clause states as a factual matter what the parties' intent *is*, not as a contractual matter what either party *must do*. *Cf. Pulaski*, 86 A.2d at 910 (holding a recital stating that the parties "have determined herewith to settle their property rights" was not binding and that "we must look to the operative part of the agreement to find out what the parties actually did"). By contrast, other provisions in the contract do impose obligations on customers. *See, e.g.*, J.A. 746 ("*You cannot* in any manner resell the Services to another party.") (emphasis added).

The second relevant feature is the caption, "Nature of our Service," which suggests that this clause is descriptive.

20

Third, as the Tenth Circuit has observed, disclaimers about a product's intended purpose abound but are not generally thought of as contractual promises. A board game might be marked "not for children under 8 years of age," but that does not create a contractual promise not to let young children play it. *Middle Man*, 822 F.3d at 533. Of course, context matters: the "Nature of our Service" clause is part of a binding contract, not on product packaging. Yet this clause resembles nonbinding statements of intent that are typically not thought of as binding promises.

Finally, the subject matter of the clause also suggests that it is a disclaimer rather than a binding contractual promise. Whether an item is "for resale" can have regulatory consequences. For example, under federal wage-and-hour laws, certain retail employees paid on commission are exempt from overtime requirements, 29 U.S.C. § 207(i), and regulations identify retail establishments based on the percentage of goods and services "not for resale," 29 C.F.R. § 779.411. This tends to suggest the clause is not a promise, but just a statement of intent designed to ensure that Sprint is treated as a retailer, not a wholesaler, for regulatory and other purposes.

Putting all this together, we conclude this clause is a background recital. That does not mean that this term is irrelevant: it may help interpret the contract's operative terms if they are unclear. But it is not a contractual promise.

B.

Next, Sprint relies on a provision of the contract stating: "You cannot in any manner resell the Services to another party." J.A. 746, 751.[7] This provision, in and of itself, is not ambiguous: everyone agrees that it prohibits reselling "Services." The ambiguity arises when we try to discern the meaning of "Services," a term that the contract defines to include various things:

> "Service" means Sprint-branded or Nextel-branded offers, rate plans, options, wireless services, billing services, applications, programs, products, or Devices on your account with us. "Service(s)" also includes any other product or service that we offer or provide to you that references these General Terms and Conditions of Service ("Ts&Cs").

J.A. 744.

Sprint has two theories for why "Services" unambiguously include all upgraded phones, even ones that are not active on Sprint's network. First, it argues, all phones sold by Sprint are "Devices on your account with us."[8] Second, each phone is a "product . . . that references" the terms and conditions. We conclude that neither theory supports summary judgment for Sprint.

---

[7] For whatever reason, this exact same language appears in two places in the contract.

[8] Sprint must also show, to invoke this provision of the contract, that the phones are "Sprint-branded or Nextel-branded." At least here, Wireless Buybacks concedes that they are.

22

## 1.

We start with the phrase "on your account with us." Here, the word "account" appears to be used in the sense of a "detailed statement of the debits and credits between parties to a contract or to a fiduciary relationship; a reckoning of monetary dealings." *Account*, BLACK'S LAW DICTIONARY (10th ed. 2014).

In everyday language, there are at least two senses in which a phone can be "on" a customer's "account." The first sense includes any historical transaction associated with the account. If a customer purchases a phone from Sprint, the purchase of the phone is a historical fact that will remain "on" his account statement no matter if the phone is ever connected to Sprint's network. Yet common sense suggests that if a phone can be placed "on" the account, then it can also be taken "off." Reflecting this intuition, there is a second sense in which something is "on" a customer's account only so long as he has some outstanding obligation with respect to it. A phone would remain "on" a Sprint customer's account if, for example, the phone is not fully paid for or is still being used to access Sprint's services. But the phone would come "off" the account once the customer owns the phone outright and it is disconnected from Sprint's network, ending the customer's obligations to Sprint with respect to that phone.

Thus, the phrase "on your account" is susceptible to two readings, at least when viewed in isolation. That does not end our analysis, because Maryland law requires us to examine the phrase in context before holding it ambiguous. *See, e.g.*, *Weichert Co. of Maryland v. Faust*, 19 A.3d 393, 404–06 (Md. 2011); *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 691–93 (Md. 2010). Yet context also pulls us in different directions.

The contextual clue offering the best support for Sprint's interpretation comes from the canon against surplusage.[9] Under Maryland law, we must avoid redundancies, giving meaning to each word and clause in the contract if we reasonably can. *E.g.*, *Orkin v. Jacobson*, 332 A.2d 901, 904 (Md. 1975). Wireless Buybacks' interpretation of the definition of "Services" arguably creates a redundancy in the definition of "Devices." "Devices" include all phones "*active* on your account with us." The word "active" thus appears to be redundant if Wireless Buybacks is correct that "on your account with us" is already limited to activated phones.

Yet this surplusage argument is hardly a slam dunk. First, it is not clear that there is a redundancy. Under the narrower interpretation, a phone could be "on" the customer's account because the customer still has not fully paid for it, even if it is not active on Sprint's network. Moreover, even if there is a redundancy, the canon against surplusage is not absolute, and Maryland law will tolerate redundancies if "no other course can be sensibly and reasonably followed." *Dumbarton*, 73 A.3d at 233 (quoting *Sagner*, 198 A.2d at 283). Other contextual clues support an argument that Sprint's interpretation cannot, in fact, be reasonably followed.

---

[9] At first glance, the "Nature of our Service" clause also supports Sprint's argument that customers were forbidden from reselling their phone. But on further examination, this clause is not so helpful to Sprint because the relevant ambiguity lies in the definition of "Services," not in the resale prohibition itself. And in one sense, the "Nature of our Service" clause is unhelpful to Sprint because it treats "customer devices" and "services" as separate terms.

The strongest clue working in Wireless Buybacks' favor is the term being defined: "Services." When a definition is unclear, "the usual criteria of interpretation . . . are brought to bear. Far and away the most important of those is the contextual factor of the word actually being defined." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW § 36, at 228 (2012). And when a customer buys a product outright, we usually consider the product a "good," not a "service." This common-sense understanding suggests that the phones at issue are not "Services." Of course, one can see why phones that are actively connected to Sprint's network would still be considered "Services" under the contract: such phones represent the gateway through which customers access the network. Thus, if I resell my activated phone to my neighbor, I am effectively reselling my cell service as well. But such reasoning does not apply to phones disconnected from the network.

The way that "Services" is used in the contract bolsters this argument. For example, a customer "can terminate Services at any time by calling us and requesting that we deactivate all Services." J.A. 745. It is hard to see how Sprint could "terminate" or "deactivate" a phone that is already disconnected from its network. Similarly, Sprint "may at any time require a deposit as a guarantee of payment for you to establish or maintain Service." *Id.* Yet there is no sense in which a customer can "establish or maintain" a phone that is disconnected from the network, nor would it make sense for Sprint to require a deposit so that the customer can continue to have something he owns.

Sprint's interpretation would also create tension between the written terms and conditions that apply to all Sprint phones and the separate agreements specific to phones

25

that are leased or billed on an installment basis. Those separate agreements provide that customers cannot resell phones until they are fully paid for. Under Sprint's interpretation, the broad resale prohibition in the terms and conditions of service would swallow up the more limited resale prohibitions in these agreements, continuing to prohibit the resale of these phones even after they are fully paid for.

For these reasons, we join the Tenth Circuit in concluding that "on your account with us" is ambiguous. *See Middle Man*, 822 F.3d at 532–33. Indeed, we note that Sprint and its agents have not adopted a consistent understanding of what it means for a phone to be "on your account with us." For example, one of Sprint's employees has taken the view that an upgraded phone is no longer subject to the resale prohibition "*after the customer has completely satisfied its financial obligations with Sprint*" (which seems to mean after the two-year renewal period following the upgrade). J.A. 894. This narrower view makes economic sense, but we have trouble seeing how it emerges from the language of the contract. Thus, Sprint adopted a broader view at oral argument, suggesting that a phone would remain "on" the customer's account so long as there is any reference to the phone in Sprint's internal records. Yet this broad interpretation—which makes the scope of "Services" depend on the vagaries of Sprint's record-keeping practices—hardly seems compelling.[10] Indeed, under this view, customers would

---

[10] Wireless Buybacks argues that such a broad prohibition on resale would violate the common law rule against restraints on alienation. *Cf. Hoffman v. L & M Arts*, 838 F.3d 568, 582–83 (5th Cir. 2016) (interpreting contract to avoid promissory restraint on resale of painting, which would be disfavored under Texas law). It is unclear whether Wireless Buybacks adequately preserved this issue for appeal: it raised the issue in a (Continued)

26

apparently be banned from reselling not just phones, but also accessories like chargers and cases, for years. *Cf. Ramlall v. MobilePro Corp.*, 30 A.3d 1003, 1016 (Md. Ct. Spec. App. 2011) ("A contract should not be construed to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."). Sprint's own difficulty articulating what "on your account with us" means confirms our conclusion that it is ambiguous.

2.

Sprint alternatively argues that phones qualify as "Services" because they are "any other product or service that we offer or provide to you that references these General Terms and Conditions of Service." J.A. 744. While the district court did not pass on this theory, we conclude that it cannot support the district court's grant of summary judgment in Sprint's favor.

Sprint's only evidence that its phones "reference" the contract consists of a single sentence in an employee declaration, which states that the written terms and conditions "are set forth in printed inserts that are included with the purchase of every Sprint Phone." J.A. 721. But this statement is too vague to support a grant of summary judgment in Sprint's favor. Does the printed insert come in the same box as the phone? Or is it provided in a separate envelope along with other details about cellular service?

---

footnote in its summary judgment brief, and obliquely at that. In any event, the district court did not address this issue, and we decline to do so in the first instance.

Are other products and devices provided at the same time? Such details might matter in applying the contract, but Sprint has not provided them.

Even if the facts were clearer, in order to obtain summary judgment, Sprint would also need to explain why the language of the contract—"references these General Terms and Conditions"—is unambiguously satisfied by a printed insert. One can imagine clearer ways for a phone to "reference" the contract. For example, perhaps the phone's screen could display the terms and conditions when it starts up for the first time. In light of such considerations, we do not think Sprint has adequately explained how the contract unambiguously supports its interpretation.

Even so, we find it unnecessary to conclude whether this part of the definition of Services is ambiguous. We hold simply that the record evidence before us is too thin to support a grant of summary judgment in Sprint's favor.

C.

Sprint also argues that it is entitled to summary judgment even if the contract is ambiguous. It claims that Wireless Buybacks has introduced no extrinsic evidence showing that Sprint customers interpreted the contract to permit them to resell their phones, meaning there is no genuine issue of material fact to present to a jury. Here too, we find Sprint's argument uncompelling.

As we have explained, it is possible for a contractual ambiguity to be resolved at summary judgment based on extrinsic evidence:

> Even where a court . . . determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment

materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).

The problem for Sprint is that its burden is higher than it thinks. Maryland courts apply the *contra proferentem* rule: if the contract remains ambiguous even after examining all available extrinsic evidence, then the ambiguity is resolved against the drafter. *See, e.g.*, *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1078 (Md. 2010); *N. River Ins. Co. v. Mayor & City Council of Baltimore*, 680 A.2d 480, 483 (Md. 1996).[11] It is undisputed that Sprint is the drafter of its terms and conditions; indeed, this is a classic contract of adhesion that Sprint presents to its customers on a take-it-or-leave-it basis. Thus, if the extrinsic evidence is a push, Sprint does not win; Wireless Buybacks does.

Moreover, not just any extrinsic evidence will do: under Maryland law, it must tend to show what *ambiguous language* in the contract meant *at the time it was entered*

---

[11] While nearly all Maryland cases applying the *contra proferentem* rule concern insurance agreements, they explain that the rule reflects "general principles of contract construction." *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (Md. Ct. Spec. App. 1997).

*into*. "Even when the use of extrinsic evidence is appropriate, it should first be directed at resolving the ambiguity in the language, and the clarified language should, in turn, be used to ascertain intent." *Dumbarton*, 73 A.3d at 236 (citation omitted). That is, extrinsic evidence must be directed to the relevant ambiguity in the contractual language: the definition of "Services." Subjective beliefs about the ultimate issue—whether the contract forbids customers from reselling phones—are not especially helpful when untethered to the contractual language. The evidence must also have some bearing on the parties' intent at the time of contracting. *See, e.g.*, *id.* at 237 (explaining that evidence of how parties interpreted a restrictive covenant years after it was agreed to did "little to resolve" the ambiguity in question).

Looking at the record before us, we do not see any extrinsic evidence so clear that a reasonable jury would have to resolve the ambiguous definition of "Services" in Sprint's favor. We therefore cannot affirm the district court's grant of summary judgment on this basis.

IV.

So much for the alleged promise not to resell Sprint phones. Sprint also seeks to invoke a different promise: it claims that Sprint customers agreed to activate their upgraded phones on Sprint's network. Customers allegedly violated this promise when they sold the phones to Wireless Buybacks without activating them.

Sprint's challenge lies in proving that customers ever made such a promise. According to a declaration submitted by one of Sprint's employees, this promise appears in Sprint's written contract. J.A. 721. But the declaration is patently wrong: the contract

30

contains no such promise.[12]  Instead, this promise appears to come from communications between Sprint employees and customers during the upgrade process.  In one email, a Sprint employee explained that, in exchange for the discounted phones, it expected "device activation on the same business account that the device was ordered within 60 days from original shipment date."  J.A. 771.

We see two hurdles Sprint must overcome to prove this theory.  First, it must show how this promise is compatible with the contract's integration clause:  "The Agreement and the documents it incorporates make up the entire agreement between us and replaces all prior written or spoken agreements—you can't rely on any contradictory documents or statements by sales or service representatives."  J.A. 751.  At first blush, the email quoted above is just such a "prior written or spoken agreement[]."  Indeed, the email contemplated that the customer would enter into a "new 2-year Service Agreement," J.A. 771, which would then "replace" anything the email said, J.A. 751.

To be sure, Sprint might be able to find a way around this first obstacle.  For example, the contract incorporates by reference "transaction materials that we provide or refer you to during the sales transaction."  J.A. 744.  Perhaps Sprint could show that emails from its employees are "transaction materials" incorporated into the contract.  Yet this seems hard to square with the contract's disavowal of all "prior written or spoken

---

[12] Of course, when an affidavit attaches a document and misdescribes its contents, it is the document itself, not the description in the affidavit, that controls.  *See Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (testimony "blatantly contradicted by the record" does not create a genuine issue of material fact (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

31

agreements," particularly those with "sales or service representatives." J.A. 751. Alternatively, the contract contemplates that "[a]dditional terms will apply when you use certain applications, programs, Devices, and services, and these terms will be provided to you prior to your use of the items." J.A. 744. But this too is an awkward fit: the promise to activate the device is not a term that applies "*when* [customers] use" upgraded phones, but rather a promise *to* use upgraded phones.

We need not decide whether Sprint can overcome that first hurdle, because it does not clear the second: it fails to show that Wireless Buybacks bought phones from Sprint customers who accepted this term. There is no record evidence that *all* Sprint customers made this promise during their communications with Sprint employees. Rather, the only evidence appears to be the lone email quoted above. This email does not show that the customer who received it ultimately agreed to receive an upgraded phone, much less that Wireless Buybacks induced the customer to resell it. Therefore, this theory cannot support an award of summary judgment in Sprint's favor.

V.

Finally, we will briefly address the parties' remaining arguments. First, Wireless Buybacks argues that there was a genuine issue of material fact about its intent, because there was evidence showing it had a good-faith belief that the contract permitted customers to resell their phones. But we find no reversible error in this part of the district court's order because, for Sprint to prevail on its tortious-interference claim, it need not show that Wireless Buybacks subjectively believed that reselling phones was prohibited by the contract. As Maryland courts have explained:

32

> [I]t is not necessary that the actor appreciate the legal significance of the facts which give rise to the contractual duty. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean.

*Daugherty v. Kessler*, 286 A.2d 95, 98–99 (Md. 1972) (quoting *Stannard v. McCool*, 84 A.2d 862, 867 (Md. 1951) (quoting Restatement of Torts § 766 cmt. d (Am. Law Inst. 1939))); *see also* Restatement (Second) of Torts § 766 cmt. i (Am. Law Inst. 1979) (similar). Here, undisputed evidence shows that Wireless Buybacks (1) knew that Sprint had a contract with its customers, (2) knew the terms of that contract (or at least, could easily have discovered them—the contract was on Sprint's website), and (3) intentionally induced at least some Sprint customers to resell their phones. While Sprint must prove that its ambiguous contract in fact prohibited resale of the phones, it need not show that Wireless Buybacks believed as much.

Next, Wireless Buybacks takes aim at the district court's damages ruling. The court found that Wireless Buybacks had raised genuine questions about the *amount* of harm Sprint had suffered, but not the *fact* that Sprint was harmed to some degree. Wireless Buybacks argues the district court got this wrong. We find this argument hard to square with Wireless Buybacks' stipulation that, if it in fact committed tortious interference with respect to all of the phones at issue, then Sprint suffered $26.9 million in damages. We therefore conclude this argument is not properly presented in this appeal.

There is a similar flaw in Wireless Buybacks' third argument. Wireless Buybacks asserts that the district court erroneously held it liable for phones that it did not induce customers to sell. But the district court's summary-judgment order did no such thing—it merely held that Wireless Buybacks was liable for inducing at least *some* customers to resell their phones, leaving open the number of times that happened. Sprint necessarily retained the burden, at the damages stage, to show how many phones Wireless Buybacks induced Sprint customers to resell. Rather than hold Sprint to that burden, Wireless Buybacks chose to stipulate to the scope of the district court's order and, ultimately, to damages. Therefore, as we have already explained in our jurisdictional analysis, this issue is also not before us.

Finally, Sprint argues that Wireless Buybacks should be held liable even if the written contract does not prohibit the resale of phones. That is because Wireless Buybacks' business practices allegedly led some customers to cancel their contracts. And it is true that, under Maryland law, liability for tortious interference can arise even without a breach of contract if the defendant maliciously or wrongfully causes the "destruction of the [plaintiff's] business relationship," for example by inducing a third party to terminate its contract with the plaintiff. *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 54 (Md. 2003) (quoting *Med. Mutual Liability Soc'y of Maryland v. B. Dixon Evander & Assocs., Inc.*, 660 A.2d 433, 439 (Md. 1995)). But Maryland courts have further explained that tortious interference "is characterized by the defendant's specific purpose to interfere, and . . . acts which incidentally affect another's business relationships are not a sufficient basis for the tort." *Alexander & Alexander Inc. v. B.*

*Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 270 (Md. 1994). We have our doubts that Sprint has shown, in the absence of a breach of contract, that Wireless Buybacks acted with the intent to disrupt Sprint's relationship with its customers. Still, we decline to decide the issue, which was not addressed by the district court.

VI.

In sum, Sprint's terms and conditions do not unambiguously prohibit customers from reselling their phones, and so Sprint was not entitled to judgment as a matter of law. We therefore vacate the district court's summary-judgment order insofar as it found Wireless Buybacks liable for tortious interference and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*